**PACIFIC COAST AGRICULTURAL EXPORT ASSOCIATION, Plaintiff-Appellant, Cross-Appellee.**

v.

**SUNKIST GROWERS, INC., Defendant-Appellee, Cross-Appellant.**

**M–C INTERNATIONAL, INC., Plaintiff-Appellant,**

v.

**SUNKIST GROWERS, INC., et al., Defendants-Appellees, Cross-Appellants.**

**Nos. 74–1093, 74–1128, 74–1094, 74–1129 and 74–1130.**

United States Court of Appeals, Ninth Circuit.

Nov. 11, 1975.

As Amended On Denial of Rehearing Dec. 17, 1975.

Rehearing Denied Jan. 29, 1976.

Certiorari Denied May 3, 1976. See 96 S.Ct. 1741.

Kristina M. Hanson (argued), Sullivan, Jones & Archer, San Francisco, Cal., for appellant in 74–1093 and 74–1094 and for appellee in 74–1128, 74–1129 and 74–1130.

Herbert A. Bernhard (argued), Greenberg, Bernhard, Weiss & Karma, Los Angeles, Cal., for appellee in 74–1093 and 74–1094 and for appellant in 74–1128, 74–1129 and 74–1130.

## OPINION

Before DUNIWAY, ELY and WRIGHT, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In this private antitrust action several parties appeal and cross-appeal from aspects of a judgment for treble damages, attorneys' fees and injunctive relief. We affirm.

Plaintiff-appellant Pacific Coast Agricultural Export Association (the Association) is a Webb-Pomeraine association [1] of fresh fruit exporters who among other things serve as middlemen in exporting oranges to Hong Kong and the Far East. Plaintiff-appellant M–C International, Inc. (M–C) also exports oranges to Hong Kong.

Defendant and cross-appellant Sunkist Growers, Inc. (Sunkist) is a federated agricultural cooperative comprised of several thousand Arizona and California citrus fruit growers who grow and pack citrus fruits for sale in the United States and abroad. Defendant and cross-appellant Reliance Commercial Enterprises, Inc. (Reliance) conducts business as a broker of citrus fruits in the Far East.

As assignee of the rights of seven of its members, the Association charged Sunkist with violating Section 1 of the Sherman Act [15 U.S.C. § 1], by conspiring with Reliance to restrain trade, and with violating Section 2 [15 U.S.C. § 2], by conspiring and attempting to monopolize and monopolizing exports from Arizona and California to Hong Kong. In a separate action M–C similarly charged both Sunkist and Reliance. The actions were consolidated for trial by agreement.[2]

The jury returned a general verdict and answered 16 special interrogatories in favor of plaintiffs, finding that Sunkist and Reliance had engaged in each alleged anticompetitive practice. The jury fixed damages at $238,704 for the Association's assignors, and $2,363 for M–C.[3]

The district court thereafter awarded treble damages and attorneys' fees of $205,250.[4] It ordered the termination of defendants' exclusive sales agreement, and enjoined Sunkist from refusing to

1. The Webb-Pomeraine Act [15 U.S.C. §§ 61–65], allows exporters to form associations for the sole purpose of marketing goods abroad. Such associations enjoy an exemption from antitrust liability for that export trade.

2. A third action, *Lepinay v. Sunkist Growers, Inc.*, No. C–69–332–CBR, was also consolidated and heard with these cases, but the jury verdict that Lepinay was not injured by any acts of Sunkist or Reliance was not appealed.

3. Sunkist and Reliance also counterclaimed under the antitrust laws. Plaintiffs prevailed on these counterclaims which are not at issue on appeal.

4. Of this amount, $5,250 was awarded in connection with defendants' motions for judgment n.o.v. or new trial.

sell oranges through its domestic and export departments to qualified buyers at competitive prices. The court refused to enjoin Sunkist from selling to Hong Kong importers, either directly or through nonexclusive agents, and also denied plaintiffs' request that Sunkist be dissolved.

Sunkist and Reliance object to any form of equitable relief and on cross-appeal urge that the verdicts be set aside for procedural irregularities, errors in the admission of evidence and insufficiency of evidence to support a verdict against either defendant. They also urge that plaintiffs failed to prove actual damages and that the attorneys' fees are excessive.

The Association and M–C argue that the district court's refusal to order dissolution was an abuse of discretion and urge that at the very least the court should have enjoined Sunkist from selling oranges, directly or indirectly, to Hong Kong for a period of six years (a period equal to that of the alleged violations).

## I.

## FACTS

Sunkist citrus growers produce about 75% of the oranges grown in Arizona and California. They process the fruit through 105 packing houses, each of which uses its own brand name as well as the Sunkist trademark. The packing houses are grouped into 20 sales exchanges.[5]

Domestic purchasers may request specific packing house brands, although a federal marketing order[6] limits the number of brand oranges which each packing house can sell in a given time period.

Hong Kong importers purchasing from Sunkist's export department may not specify particular brands, although they may specify a general varietal preference for central valley or southern California oranges. While no federal marketing order limits export sales, Sunkist's export department allocates sales, by means of "pooling" arrangements, largely on a pro rata basis among the several packing houses.

Until 1966, Sunkist's export department relied upon numerous exporting companies, including members of the Association, to generate and maintain sales to Hong Kong importers. In March of that year, Sunkist terminated these arrangements and began direct sales to Hong Kong through Reliance, its new exclusive agent there. Sunkist performed all export functions, including handling, shipping and insurance. Reliance, through its Hong Kong manager Newman Wu, obtained letters of credit from Hong Kong importers, transmitted orders and price quotations to Sunkist, and generally represented Sunkist's interests in Hong Kong.

In the six months following its agreement with Reliance, Sunkist (which had previously sold direct to Hong Kong only upon occasion) was able to capture nearly 70% of the market for American oranges sold there.[7] The plaintiffs, who had previously been largely supplied by Sunkist's export department, were now able to obtain Sunkist oranges only on the domestic market. Evidence was introduced from which the jury might have inferred that the plaintiffs were at

---

**5.** Sunkist's operations have not changed markedly from those described by the Supreme Court in *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384, 386–89, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

**6.** 7 C.F.R. 907, 908 (1975), issued pursuant to the Agricultural Marketing Act [7 U.S.C. § 601 *et seq.* (1970)].

**7.** The percentage sold by plaintiffs and other exporters later increased somewhat, ranging between 38.1% and 55.5% from 1967 to 1971. Although an improving overall market in Hong Kong allowed three of the Association's assignors to attain 1970 volume sales exceeding comparable pre-1966 figures, neither M–C nor any of the assignors has regained its pre-1966 share.

times prevented from purchasing even on the domestic market.

## II.

### SCOPE OF CAPPER–VOLSTEAD IMMUNITY

As a threshold matter we must determine the extent to which the federal antitrust laws apply to Sunkist's activities. Sunkist claims that it presently[8] qualifies as a grower cooperative under Section 1 of the Capper-Volstead Act [7 U.S.C. § 291], and that therefore its members' joint activities enjoy a broad exemption from the antitrust laws under that act and Section 6 of the Clayton Act [15 U.S.C. § 17]. *See generally Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 210–18 (9th Cir. 1974); Annotation, 20 A.L.R.Fed. 924 (1974).

■ Sunkist contends that the designation of Reliance as its exclusive agent in Hong Kong was protected conduct under the language of Capper-Volstead Act § 1 providing that:

> [s]uch [cooperative] associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . . . .

It is well settled, however, that the rights of growers to market cooperatively cannot be deemed to authorize any combination or conspiracy with others which unreasonably restrains interstate or foreign commerce. *United States v. Borden Co.,* 308 U.S. 188, 204–05, 60

S.Ct. 182, 84 L.Ed. 181 (1939). The court instructed the jury that to find a violation of the Sherman Act, Section 1, the jury had to find that "the purpose and effect of such an agreement is unreasonably to exclude the former distributors [plaintiffs] from engaging in the trade in question." To this instruction no party objected. [*See* F.R.Civ.P. Rule 51.]

■ Nor does the Act immunize cooperatives engaged in competition-stifling practices from actions under the antimonopolization provisions of Sherman Act § 2. *Maryland & Virginia Milk Producers Association, Inc. v. United States,* 362 U.S. 458, 463, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra,* 497 F.2d at 216. *See also Tillamook Cheese & Dairy Association v. Tillamook County Creamery Association,* 358 F.2d 115 (9th Cir. 1966).

■ The district court properly instructed the jury as to the scope of Capper-Volstead immunity, and there was no challenge by any party.

## III.

### SECTION 1 CLAIM·[9]

■ The unchallenged jury instruction on the Section 1 claim fairly embodied the law of this circuit which requires evidence of an agreement the purpose or effect of which is to unreasonably restrain trade. *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119–20 (9th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). The

---

8. In *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), the Supreme Court held that the Capper-Volstead Act does not exempt associations with non-grower packing house members. Sometime in 1968 Sunkist reorganized to bring itself within the Act's exemption, as interpreted by the Court. In *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.,* 355 F.Supp. 408 (C.D.Cal.1971), the court determined that the 1968 reorganization had brought Sunkist within the protection of the Act.

The district court in the case at bar instructed the jury that Sunkist was entitled to the protections of the Capper-Volstead Act. We assume for the purpose of this case that Sunkist qualifies but need not decide the question. *See generally* 20 A.L.R.Fed. 913, *et seq.* (1974).

9. Damage issues under all claims are discussed in Section V, *infra.*

jury was properly instructed that the formation of an exclusive agency agreement was not illegal *per se. Hawaiian Oke* at 76. A good faith, economically motivated decision to switch exporters, as Sunkist has correctly noted, would not subject it to Section 1 liability. *Alpha Distributing Co. v. Jack Daniel Distillery*, 454 F.2d 442, 452 (9th Cir. 1972). Rather, the plaintiffs were required to show that Sunkist's refusal to deal was motivated by a desire to exclude the plaintiffs from the market or to accomplish some other anti-competitive objective. *Bushie*, 460 F.2d at 119–20; *Ricchetti v. Meister Brau, Inc.*, 431 F.2d 1211, 1215 (9th Cir. 1970). Deciding Sunkist's motivation was peculiarly a question for the jury. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 49 S.Ct. 400, 71 L.Ed. 684 (1927). Its determination is conclusive unless erroneous as a matter of law. *Id.*

■ The jury's finding that defendants had unlawfully agreed to unreasonably restrain trade is amply supported by the evidence. There were communications from Reliance to Sunkist seeking restrictions on the supply of domestic oranges available to the exporters, followed by Sunkist actions which could be interpreted as attempts to prevent regional exchanges under its control from selling oranges to plaintiffs. Sunkist attempted to secure more shipping space than needed to accommodate its own orders, knowing that plaintiffs might be foreclosed thereby from shipping many of their orders. Sunkist supplied Reliance with a list of Hong Kong customers acquired by plaintiffs. Early in 1966 Sunkist not only stopped issuing quotations, but also terminated export sales, to domestic exporters.[10]

■ Although one or more of these actions could be regarded as reasonable responses to competitive pressures, *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (9th Cir. 1974); *Joseph E.*

*Seagram & Sons, supra*, the cumulative evidence was sufficient to permit the jury's finding that they were illegally motivated. *Cf. DeVoto v. Pacific Fidelity Life Insurance Co.*, 516 F.2d 1, 5–6 (9th Cir. 1975). The inference of an implied agreement can, as in this case, be a sufficient basis upon which to predicate liability under Section 1. *Blankenship v. The Hearst Corp.*, 519 F.2d 418, 428 (9th Cir. 1975).

## IV.

## SECTION 2 CLAIM

The record shows it was well within the province of the jury to find that defendants had monopolized, attempted to monopolize and conspired to do so.

### A. *Monopolization.*

■ The jury was properly instructed that plaintiffs had the burden of proving: (a) that the relevant market was the one claimed, *viz.* "oranges grown in Arizona and California for export to Hong Kong;" (b) that Sunkist possessed monopoly power ·in the relevant market, and (c) that Sunkist committed acts which constituted monopolization of that market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698,· 16 L.Ed.2d 778 (1966).

■ Defendants argue that the phrase "oranges grown in Arizona and California for export to Hong Kong" describes a supply, not a distribution, market and that plaintiffs' failure to show illegal monopolization in the supply market frustrates the Section 2 claim.

Surely this argument must fail. In the context of this case it is abundantly clear that the relevant market is that of distribution. In its complaint the Association charged Sunkist with "monopolizing . . . all or most of the *trade and commerce* in citrus fruits with . . Hong Kong," and with specific efforts to "monopolize such trade and commerce."

10. These facts also support the conclusion that unreasonable restraint of trade was effectuated. However, we need not reach this issue since unlawful purpose alone is enough to support a finding of an "actionable conspiracy." *Bushie, supra,* 460 F.2d at 120.

(Emphasis added.) In its complaint M–C charged monopolization and restraint of trade in "the sale and shipment of citrus fruits from California to Hong Kong."

It would be absurd for plaintiffs to define the relevant market as supply, when throughout the trial it was conceded that Sunkist enjoyed Capper-Volstead protection for production activities. Rather, plaintiffs attempted to show, and did show, that Sunkist's control of supply was employed to extend its monopoly illegally into distribution. *Compare Otter Tail Power Co. v. United States*, 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). *See also The Supreme Court, 1972 Term*, 87 Harv.L.Rev. 57, 277–79 (1973).

■ Defendants also suggest the export of domestic "brand" and export "pool" oranges constituted separate submarkets after 1966. They argue that plaintiffs were interested only in the domestic "brand" submarket, and that any alleged monopolization of the "pool" submarket did no damage to plaintiffs. There is insufficient evidence in the record to show with any exactitude the degree of cross-elasticity of demand between "brand" and "pool" oranges. The jury was free to view these as substitute goods in Hong Kong, and it appears to have done so.

■ Sunkist's control of the Hong Kong export market ranged from 45 to 70% during the period 1967 to 1971. Some past decisions have required larger percentages to show monopoly power. *See, e.g., United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945). However, it is now well settled that market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power. In *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct.

1698, 1704, 16 L.Ed.2d 778 (1966), the Court stated:

> In *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264, we defined monopoly power as "the power to control prices or exclude competition." The existence of such power ordinarily may be inferred from the predominant share of the market.

■ Here Sunkist's competitors, although organized into a trade association, were relatively small, with no single competitor controlling over 18% of the market before, or 12% of the market after, Sunkist's entry. Moreover, Sunkist's acknowledged control over the supply market clearly facilitated the acquisition of monopoly power in the distribution market. These facts adequately support the jury's finding that defendants possessed monopoly power in the relevant market.

■ Several acts of defendants could readily be interpreted by the jury as acts of monopolization. Among these were Sunkist's attempts to restrict the supply of oranges available to plaintiffs, to divert domestic fruit from plaintiff for direct sale to Hong Kong importers, to fraudulently persuade plaintiffs to surrender their customer lists, and to demand shipping advantages for its export operations commensurate with and exceeding its controlling share of the supply market.[11] While Sunkist asserts that its dominance in the Hong Kong export market resulted from its ability, based upon superior efficiency and diligence, to charge lower prices than the middlemen-exporters and from its willingness to accept lower and more reasonable profit margins, it was open for the jury to conclude that more than superior techniques were involved in the rapid rise to market dominance.

---

11. The same acts may constitute both an unreasonable restraint of trade and monopolization. *Maryland & Virginia Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 463, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).

## B. *Attempt to Monopolize.*

The district court instructed the jury that attempted monopolization must be shown by specific intent to monopolize a relevant market, together with a "wrongful" act (or acts) in furtherance of that intent which "create the likely probability" of monopolization. *Compare Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905) (requiring "dangerous probability" of success).

■ Sunkist argues that language in *Hallmark Industry v. Reynolds Metal Co.*, 489 F.2d 8, 12–13 (9th Cir. 1973), requires a finding of "predatory conduct directed to accomplishing the unlawful purpose" to support an attempted monopolization charge. Even assuming the applicability of *Hallmark* to this case,[12] Sunkist's argument is unavailing. *Hallmark* suggests that the requisite "dangerous probability" of success can be inferred from either specific intent coupled with monopoly power *or* from "proof of specific intent to set prices or exclude competition . . . accompanied by predatory conduct directed to accomplishing the unlawful purpose." 489 F.2d at 12. Since the jury specifically found, in answer to written interrogatories, both specific intent and monopoly power, the *Hallmark* test is satisfied.[13]

## C. *Conspiracy to Monopolize.*

■ There was sufficient evidence in the record to permit the properly instructed jury to conclude that Sunkist and Reliance had conspired with the specific intent to monopolize a line of commerce. While an agreement for exclusive distribution of one's own product does not of itself constitute a conspiracy to monopolize, *Bushie v. Stenocord Corp.*, 460 F.2d 116, 120 (9th Cir. 1972), there was also evidence in the record support-

ing inferences of joint action to preclude exporters from shipping space, joint use of exporters' customer information, and the exclusion or restriction by agreement of exporters from domestic as well as export "pool" oranges.

## V.

## DAMAGES

■ Sunkist correctly notes that a private antitrust verdict cannot be sustained without proof of injury. *Gray v. Shell Oil Co.*, 469 F.2d 742, 749 (9th Cir. 1972). The district court so instructed the jury as to each charge, and the requirement was reiterated as to each charge in the written interrogatories.

Sunkist argues *inter alia* that the appellants' damages did not arise proximately from the alleged illegal activity, that the trial judge erroneously allowed a hypothetical question on the damages issue which assumed facts not in evidence, and that market share projections were improper.

## A. *Damage Causation.*

■ Sunkist's contention, like that discussed above in dealing with the "relevant market," is that plaintiffs lost no sales or profits from insufficient supply of export "pool" oranges, since they would not have purchased them even if they were available. We pause here only briefly. As previously stated, the jury could reasonably conclude that there was but one market for Sunkist oranges, be they "pool" or "brand". It could likewise conclude that either the refusal to sell export "pool" oranges, or the restriction of plaintiffs' ability to purchase domestic "brand" oranges, or a combination of both, proximately led to diminution of plaintiffs' market share. Such clearly constitutes "reasonable

---

12. The decision was filed more than one year after the verdict in the instant case.

13. Although the jury found the existence of "monopoly power" in answer to an interrogatory dealing with the monopolization charge, it is clear that the jury had the same "monopoly power" in mind in connection with the at-

tempted monopolization charge. Likewise, the jury's finding, in connection with the monopolization charge, of a conspiracy constituting an unreasonable restraint of trade was surely kept in mind during deliberation of the attempted monopolization charge.

probability [of] the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue." *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.), *cert. denied* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). *See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke Liquors, Ltd.*, 416 F.2d 71, 85–88 (9th Cir. 1969), *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).[14]

### B. *The Hypothetical Question Allegedly Assuming Facts Not In Evidence.*

■■■ Defendants contend that, notwithstanding Sunkist's illegal agreements with Reliance, Sunkist would have competed with plaintiffs in the post-1966 export trade. They therefore object to the district court's allowance of the following hypothetical question propounded by plaintiffs' counsel to each of plaintiffs' witnesses on damages:

Q. [Plaintiffs' Counsel]: . . . do you have an opinion as to the number of oranges Liberty Gold [or each other exporter] would have sold in Hong Kong had you been able to purchase oranges from Sunkist's export department as you had prior to 1966, *and assuming that Sunkist was—did not sell oranges in Hong Kong for the period subsequent to March 1966?* (Emphasis added.)

This question, defendants argue, induced the finding of an improper amount of damages since much of plaintiffs' diminished market share could have resulted from legitimate competition by Sunkist.

This argument is patently frivolous. Defendants' illegal seizure of a market share to the plaintiffs' injury is not protected merely because the defendant might have achieved the same result by legal means. Moreover, the evidence was conflicting, and the jury may well have concluded that Sunkist would not have taken the risks of entering the export market but for the assurance of an inordinately large return.[15] Such a conclusion complies with the *Flintkote* standard, *supra*.

On numerous occasions the district court instructed the jury, without challenge, of the need to find a causal connection between the unlawful conduct and injury to plaintiffs. In view of this we cannot say that the jury verdict was influenced improperly by the hypothetical question.

### C. *Market Share Projections.*

Aside from Sunkist's argument that it would have competed in the post-1966 Hong Kong export market even absent the illegal agreement with Reliance, Sunkist and Reliance also contend that in any event the post-1966 expansion of the Hong Kong market was due solely to their innovations and skill in promoting the sale of American oranges and achieving efficiencies in their distribution to Hong Kong importers. Therefore, they argue, the district court erred in allowing plaintiffs to predicate damage estimates on the theory that plaintiffs would have maintained their pre-1966 market shares in the expanding post-1966 market.

To rebut the defense evidence, plaintiffs offered proof that the market expansion occurring after 1966 came about at least in part because of a general increase in population and income in Hong Kong. Two experts testified that sales of American oranges to Hong Kong would have increased regardless of Sunkist's direct entry into the market.

■■■ Plaintiffs' method of measuring damages, known as the "before and after" theory, may be used only where

---

14. We are mindful of the greater quantum of proof requisite to show the fact of damage as distinguished from the amount thereof. *Flintkote, supra,* 246 F.2d at 392.

15. Sunkist, of course, could have phrased the same question to plaintiffs' witnesses on cross-examination, but employing the opposite assumption that Sunkist would have entered the market directly even absent its agreement with Reliance.

there has been some showing that the market conditions in the two periods were similar but for the impact of the violation. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259–63, 66 S.Ct. 574, 90 L.Ed. 652 (1946). While this test would not allow a verdict to rest on bare allegations of lost profits and causation, the Supreme Court also ruled in *Bigelow* that:

> . . . [I]n the absence of more precise proof, the jury could [infer] from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes*, that defendants' wrongful acts had caused damage to the plaintiffs.

*Id.* at 264, 66 S.Ct. at 579. (Emphasis added.)

 While plaintiffs' evidence as to the causes of the change in market scope was not overwhelming, it was sufficient to support a "just and reasonable estimate of the damage" by the jury. 327 U.S. at 264, 66 S.Ct. at 580. A defendant whose wrongful conduct has rendered difficult the ascertainment of the amount of damages suffered may not complain that they cannot be measured with exactness and precision. *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Hobart Brothers Co. v. Gilliland*, 471 F.2d 894, 903 (5th Cir. 1973).

### D. *Other Objections.*

Sunkist and Reliance allege other errors as to damages which deserve brief mention.

 The suggestion that the period of damage be limited to the latter half of 1967 is frivolous. There was evidence of continuous illegal conduct, and resultant injury, from 1966 through 1971. The jury was well within its province to conclude that in fact injury occurred throughout that period.

 Plaintiffs' expert witnesses who testified at the trial on damages were properly qualified as experienced businessmen capable of providing information and opinions based on practical experience. *See Hazeltine Research, Inc., v. Zenith Radio Corp.*, 239 F.Supp. 51, 76 (N.D.Ill.1965), *rev'd on other grounds*, 388 F.2d 25 (7th Cir. 1967), *aff'd in part and rev'd in part on other grounds*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). To avoid any prejudice, the district court properly cautioned the jury as to the limits of the witnesses' expertise.

## VI.

## EQUITABLE RELIEF

Sunkist objects to all injunctive relief granted by the district court and the Association in turn requests that Sunkist be dissolved, or in the alternative that broader injunctive relief be granted. Each argument will be discussed below.

### A. *Alleged Impropriety of Injunctive Relief Granted.*

#### 1. *Standing.*

Sunkist contends that the Association lacks standing to obtain any form of equitable relief.[16] Further, it contends, the *de minimis* damage suffered by M–C ($2,363) does not in equity justify the extensive injunctive relief granted.

 Section 4 of the Clayton Act [15 U.S.C. § 15], provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor.". While an association may not sue on its own to assert the rights of its members under the antitrust laws, it may sue as assignee of the legal rights

---

**16.** The contention was first made four and a half years after the filing of the complaint. The failure to timely object casts doubt on the argument that the lack of standing constitutes

a bar. *See Environmental Defense Fund v. Environmental Protection Agency*, 150 U.S. App.D.C. 348, 465 F.2d 528, 530–531 n.1 (1972).

of others. *Northern California Monument Dealers Ass'n v. Interment Ass'n of California,* 120 F.Supp. 93, 94–95 (S.D. Cal.1954). As assignee, it steps into the shoes of its assignors. *Id.*

■ Sunkist concedes that the Association's members "assigned their claims to [the] Association for the purposes of this suit." It asserts, however, that the members could not and did not assign their "claims" for injunctive relief. The question of what rights and remedies pass with a given assignment depends upon the intent of the parties. *Northwest Oil & Refining Co. v. Honolulu Oil Corp.,* 195 F.Supp. 281, 286 (D.Mont. 1961).

■ Since in its complaint the Association recites the assignment of members' "claims," and thereafter prays for both damages and equitable relief,[17] it follows that the parties clearly attempted to assign both legal and equitable claims. We need only determine whether they could do so as a matter of law.

■ The question turns on whether the Association is the "real party in interest" within the meaning of Fed.R. Civ.P. 17(a). The basic purpose of the rule requiring that every action be prosecuted by the real party in interest is to protect a defendant from subsequent similar actions by one not a party to the initial action. *Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.,* 485 F.2d 78, 84 (4th Cir. 1973), *cert. denied* 415 U.S. 935, 94 S.Ct. 1450, 39 L.Ed.2d 493 (1974); *United Federation of Postal Clerks, AFL–CIO v. Watson,* 133 U.S. App.D.C. 176, 409 F.2d 462, 470–71 and n.34, *cert. denied sub nom. Blount v. United Federation of Postal Clerks, AFL–CIO,* 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969); *Dubuque Stone Products Co. v. Fred L. Gray Co.,* 356 F.2d 718, 723 (8th Cir. 1966); *Celanese Corp. of America v. John Clark Indus-*

tries, 214 F.2d 551, 556 (5th Cir. 1954). There is here no likelihood that any member of the Association will sue subsequently, since the equitable relief granted redounds to the benefit of all members, whether or not they assigned claims to the Association.

■ Whether an unincorporated association may seek equitable relief for its members under Sections 4 and 5 of the Clayton Act [15 U.S.C. §§ 15 and 16], is clearly a matter of federal law. Fed.R. Civ.P. 17(b). *Cf. Klebanow v. New York Produce Exchange,* 344 F.2d 294, 296 (2d Cir. 1965). The Supreme Court has stated: "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). *See also NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *National Automatic Laundry & Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 693–94 (1971), and cases cited therein.

■ Our recent decision in *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975), underscores this court's recognition that a private antitrust decree may and should be broad enough to restore competition in the relevant market. In that case we held:

> Injunctive remedies under § 16 may be as broad as necessary to ensure that "threatened loss or damage" does not materialize or that prior violations do not recur. . . . [W]e are confident that the pernicious manifestations or tendencies of an illegal vertical combination . . . are susceptible to direct injunctive restraint.

518 F.2d at 925. (Footnote omitted.)

■ These considerations compel us to conclude that, at least where, as here, the assignors are members of the trade

---

**17.** Under Fed.R.Civ.P. 2, all legal and equitable claims are to be joined in one "civil action." *See* 2 J. Moore, Federal Practice ¶ 2.01, at 303–07 (2d ed. 1975). Thus it is logical to assume the word "claim" includes both legal and equitable causes, absent evidence of contrary intent.

association bringing suit, the assignee association may seek whatever equitable relief may be available to each assignor. This holding should both minimize the possibility of multiple lawsuits, and promote the broad remedial purposes of the antitrust laws.

### 2. *Propriety of the Relief Granted.*

The district court ordered that:

2. Sunkist be enjoined from refusing to make available to qualified purchasers oranges from the domestic department, regardless of the ultimate purpose for which that purchaser seeks the oranges; and

3. Sunkist be enjoined from refusing to sell oranges from its export department to any qualified exporters. The price to such exporters shall not exceed the net price at which Sunkist markets its oranges directly in Hong Kong. The net price shall be determined by deducting from quoted price in Hong Kong the cost of insurance, ocean freight, tolls, handling, commission to agents, and all other payments to third parties arising from the export of said oranges to Hong Kong.

 Sunkist objects to the first paragraph on the ground that the relief granted will undermine the ability to market on a cooperative basis. However, the possibility that some packing houses may have to violate Sunkist's by-laws should not frustrate the district court's attempt to restore competition. *Compare Otter Tail Power Co. v. United States,* 410 U.S. 366, 378–79, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (otherwise valid contracts properly enjoined where they were part of a scheme to promote attempted monopolization and restraint of trade).

If Sunkist should ever find itself faced with the choice of complying with either the court's decree or a federal marketing order, it may petition the district court for guidance or modification. A similar petition might be in order if shortages should arise and Sunkist should need to apportion its available oranges among its regular customers.[18]

Sunkist also objects to the requirement that it sell export department oranges to "any qualified exporters." While it may be that plaintiffs are not in a position to buy such oranges at the going rates, once Sunkist's rates are lowered to the "net price" as ordered, the demand will undoubtedly rise. This order is well within the court's broad remedial discretion.

### B. *Plaintiffs' Request for Dissolution or Broader Injunction.*

In considering plaintiffs' request for Sunkist's dissolution or an order enjoining it from selling oranges and Reliance from selling Sunkist oranges in Hong Kong for six years, the district court held that:

> even assuming arguendo that [the court] has the power to award such relief to a private antitrust litigant, there has been no showing in this case which would justify, much less require, the extreme relief requested.

 This court has subsequently ruled that the dissolution remedy is not available to private antitrust litigants. *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d at 922. We indicated that extensive direct injunctive restraints would be appropriate where essential to prevent the "pernicious manifestations or tendencies" of unlawful anticompetitive activities. *Id.* at 925. In this case, however, the district court clearly found the requested relief unnecessary to restore plaintiffs' ability to compete in the Hong Kong market.

 On the facts before it, the court might well have determined that an injunctive order of the sort sought by plaintiffs would be unworkable and superfluous, and that it might hinder rather than promote competition in the Hong Kong export market. *Cf. Ford Motor*

---

**18.** The district court properly retained jurisdiction of the case to effectuate its decree as necessary.

Co. v. United States, 405 U.S. 562, 568, 573, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). The district court granted substantial injunctive relief aimed at restraining appellees' anticompetitive activities, and we cannot say that the relief was inadequate.

## VII.

## MISCELLANEOUS ASSERTIONS

A. *Alleged Misconduct by Plaintiffs' Counsel.*

■ Appellees contend that the district court should have granted judgment n.o.v. or in the alternative a new trial because of misstatements by plaintiffs' trial counsel at closing argument concerning Sunkist's "admission" of a conspiracy, the failure of Sunkist's accountants to testify, the treatment of employee salaries in determining lost profits, and other matters. In reviewing the record we are impressed not only with the frivolity of these claims, but also with the great care exercised by the district court in conducting the trial and cautioning the jury. There was no error.

B. *Attorneys' Fees.*

■ Appellees contend the attorneys' fee award (83% of single damages) is excessive as a matter of law. This court has recognized that determination of reasonable attorneys' fees requires consideration of a variety of factors. *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 221 (9th Cir. 1964). After considering all of the appropriate factors, the court concluded that because of the magnitude, complexity and length of the litigation and the risk involved, a fixed percentage rule would be particularly inappropriate in this case and the 83% figure was to be "attributed no special significance."[19] The court's action is clearly within the contemplation of the rule laid down in *Twentieth Century Fox*.

## VIII.

## CONCLUSION

The judgment of the district court is in all respects affirmed.

19. The district judge devoted five pages of his memorandum opinion to a discussion of the factors to be considered by a court in awarding counsel fees, in light of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 245 F.Supp. 258, 302–303 (M.D.Pa.1965). He commented in detail on each of the eight factors. He noted "the presence of very eminent counsel on both sides of this case with very substantial experience in antitrust litigation." He drew upon his own knowledge of the time spent by counsel on "conferences, arguments, and time spent on the case both prior to as well as during the trial."

The court also demonstrated considerable knowledge of the contributions made by legal assistants to the attorneys, noting

"As a matter of practice, most attorneys engaged in the antitrust practice use such legal assistants, particularly in digesting and indexing discovery and trial materials, much of the work heretofore performed by relatively inexperienced lawyers . . . . As a matter of policy, the use of paralegal help in this fashion greatly reduces the cost of legal services to the public and is thus a practice to be encouraged."

The court then approved the award of fees for such paralegal help after adjusting it slightly downward.

We would be sorely pressed to find a case in which the trial judge paid greater attention to the law and circumstances in deliberating over the award of attorneys' fees.