C. O. HANSON, Plaintiff-Appellant,

v.

SHELL OIL COMPANY,
Defendant-Appellee.

No. 74–1034.

United States Court of Appeals,
Ninth Circuit.

Sept. 3, 1976.

**1354**

John H. Boone (argued), San Francisco, Cal., for plaintiff-appellant.

William Simon (argued), of Howrey, Simon, Baker & Murchison, Washington, D. C., for defendant-appellee.

Before DUNIWAY and WRIGHT, Circuit Judges, and LUCAS,* District Judge.

DUNIWAY, Circuit Judge:

In this action appellant Hanson charged appellee Shell Oil Company and defendants Standard Oil Company of California and Gulf Oil Company with violations of § 7 of the Clayton Act, a vertical restraint of trade and horizontal restraint of trade, both under § 1 of the Sherman Act, and attempt and conspiracy to monopolize under § 2 of the Sherman Act. The trial court granted summary judgment to all defendants based on all acts occurring before December 23, 1964, and to Gulf on the § 7 Clayton Act charge. At trial, directed verdicts were entered for all defendants on all remaining claims except for the horizontal restraint charge under § 1 and the conspiracy charges under § 2 of the Sherman Act against Shell and Standard. The jury returned a verdict on those two charges for Hanson and awarded damages of $363,-181.31, which when trebled would exceed $1 million. Defendants Shell and Standard moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The court denied the motions for judgment n.o.v., but granted a new trial on the two issues that had been submitted to the first jury. At the new trial, against Shell alone, the second jury found for the defendants. Hanson now appeals, asserting error in (1) the granting of the motion for a new trial, and (2) granting the directed verdict for Shell on the § 1 vertical restraint claim and the § 2 attempt to monopolize claim. He also attacks the court's instruction to the second jury concerning acts occurring before December 23, 1964, and the rejection of certain evidence. Shell is the only appellee, Hanson's claims against Standard having been settled. We affirm.

* The Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

## I. *Statement of the Facts.*

Hanson moved to Tucson, Arizona, in 1952, having assets of less than $7,000. He invested this money in his first service station under the name of "Hanson's Direct Service." Over the following ten years he expanded his business to include seventeen service stations along with a distributorship for El Paso Natural Gas products which he acquired in 1958. Throughout the entire period from 1952 to 1964, Hanson's business lost money in all but three years, and in those three years he failed to make enough to equal the $8,000 that he thought was a reasonable value for his managerial services. Thus, Hanson's expansion was financed entirely through credit, much of which was unwilling. Hanson admitted at the first trial that he used money from gasoline sales to acquire new stations rather than to pay his gasoline bills to his suppliers. Thus, by 1964, Hanson had turned his just under $7,000 into seventeen old service stations, one natural gas distributorship, and hundreds of thousands of dollars of debt.

Hanson's business was continually short of cash. By the end of 1964, he owed substantial amounts to over thirty creditors, and he had exhausted his credit. Hanson could buy gasoline only on a cash and carry basis. This, the relatively shoddy condition of his stations, and his difficulty in keeping station managers, combined to keep Hanson's monthly gasoline sales average around 10,000 gallons per station, while other independent dealers in Tucson were averaging four to five times that amount. Testimony at the first trial indicated that with such a low sales volume a dealer could not continue to operate indefinitely.

Because of these hopeless conditions, beginning in 1962, Hanson attempted to sell his entire business, but, not surprisingly, he was unable to find any interested buyers. In July of 1966, Hanson finally closed out his business. Like many another loser in the competitive endeavor, he decided to try the antitrust laws as a means of shifting his losses to someone else. He brought the present action against Shell, Standard, and Gulf on December 23, 1968, two and one-half years later.

Hanson claims that he was the victim of an endless series of retail gasoline price wars which plagued the Tucson market from 1958 to well after Hanson shut down his business in 1966. He claims that the cause of these price wars was the policy of Shell and Standard Oil, by price gouging, to run private brand and independent dealers out of the market. He points specifically to a change in Shell's pricing policy adopted in 1961 whereby Shell began a program of more vigorous price competition designed to regain the market share in the Western Region which Shell had lost in the previous six years. Hanson claims that in furtherance of this plan to seize market strength from the small private brand and independent dealers, Shell threatened and coerced its retail dealers to conform to Shell's suggested predatory prices, and also enlisted Standard's cooperation so that their efforts could be directed solely at the independents rather than at each other. The complaint alleged that because of the vertical restraints placed on the Shell dealers and the horizontal arrangement with Standard, Shell violated §§ 1 and 2 of the Sherman Act and thereby caused Hanson to lose his business.

## II. *The Directed Verdict on the § 1 Vertical Restraint Claim was Proper.*

■ Hanson claims that Shell violated § 1 of the Sherman Act by fixing the retail price of gasoline sold by franchised Shell dealers. This vertical price fixing was supposedly accomplished through the use of company-owned stations which could put competitive pressure on franchised dealers, · through the use or non-use of "dealer assistance," and through threats of refusals to deal such as not renewing dealer leases. After hearing all of the evidence, the trial court directed a verdict for Shell on this claim.

In the absence of fair-trade statutes, vertical resale price maintenance agreements are *per se* violations of § 1. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,*

1911, 220 U.S. 373, 399–400, 31 S.Ct. 376, 55 L.Ed. 502. This is true even though the agreement be only an implied one. *F.T.C. v. Beech-Nut Packing Co.*, 1922, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307. If the agreement between the supplier and his buyer is reached because of coercive conduct toward noncomplying buyers, such as refusals to deal, a violation is also made out. *Simpson v. Union Oil Co.*, 1964, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98. The refusal to deal which gave rise to the vertical agreement in *Simpson* was Union Oil's failure to renew a dealer's lease because of his lack of compliance with the company's suggested resale prices. Thus, if the evidence presented at the first trial, taken in the light most favorable to Hanson, could support a finding that there was a coerced agreement between Shell and its retail dealers, the directed verdict must be reversed. *Cornwell Quality Tools v. C.T.S. Co.*, 9 Cir., 1971, 446 F.2d 825, 830.

Hanson points to three different items of evidence which he claims to be sufficient to require that the § 1 vertical restraint claim be submitted to the jury. First, there was evidence that during the early 1960's Shell maintained one or two company-owned stations in Tucson which would set the retail price at the point the company recommended and thus put pressure on the other Shell dealers to comply. There are a number of reasons why this does not support Hanson's case. Hanson claims that Shell's war against the independents was waged in the Western Region encompassing five states, so that the fact that two company stations were maintained in Tucson, Arizona, is hardly evidence of coercion of Shell dealers throughout the relevant market. Moreover, even if the relevant market were limited to Tucson, two company-owned stations out of the multitude of Shell brand stations that existed in Tucson's eight trade areas would not be evidence of pressure being put on the franchise dealers. Han-

son's own witness, a Mr. Wolken, the largest Shell brand franchisee in Tucson, testified that to his knowledge there were no company-owned Shell stations in Tucson. Finally, even if such pressure did flow from maintaining company-owned stations, there is no legal or economic reason for finding the use of such market pressures to be violative of § 1.

Hanson next points to Shell's use of "dealer assistance," a pricing system whereby Shell lowered its "tank wagon price" (wholesale dealer price) to dealers whenever it recommended that the dealers reduce their retail prices.[1] Hanson contends that by reducing the tank wagon price whenever it recommended a lower retail price, Shell put pressure on the individual dealer to follow the recommendation, because every other Shell station would be priced below him if he did not. This argument has no merit. The uncontroverted evidence shows that dealer assistance was provided by Shell in a given area to individual dealers who asked for it. Dealers asked when they felt forced to lower their retail prices in order to meet local competition but felt financially unable to absorb the entire price reduction out of their margin. Thus, they asked Shell to give them dealer assistance so that they could meet competition without extreme financial sacrifice. The program was not initiated by Shell to force dealers to fix prices, but was initiated by dealers to enable them to stay competitive.

If Shell conditioned "dealer assistance" on a dealer's actually reducing his retail price, a more serious look at possible § 1 violations would be warranted. *See Lehrman v. Gulf Oil Corp.*, 5 Cir., 1972, 464 F.2d 26. However, the testimony of Hanson's witness, Mr. Wolken, was that the changes in tank wagon price made by Shell were made for every dealer on request, whether or not the requesting dealer suggested changes in retail price, and the testimony of another Shell dealer in Tucson, Mr. Mer-

---

1. For each of the first four cents in recommended retail price reduction, Shell lowered the tank wagon price to its dealers by three-fourths of a cent. Thus, after a four-cent recommended reduction, Shell absorbed three cents. After the first four cents, Shell reduced the tank wagon price on a penny for penny basis absorbing 100% of all recommended price reductions.

gard, also a witness for Hanson, verified that Shell's policy was that any "dealer assistance" was not predicated on the dealer's retail price. Thus, the "dealer assistance" program could not be construed as an attempt by Shell to regulate its dealers' retail prices.

Finally, Hanson points to the testimony of his witnesses, Messrs. Wolken and Mergard, claiming that it shows that coercive tactics were used by Shell representatives to gain dealer compliance. In fact, the testimony of these two dealers supports Shell, not Hanson. The only part of Wolken's testimony which even arguably supports a claim of coercion involves a bit of fancy questioning by Hanson's attorney. After questioning Wolken on how price conversations with his Shell representative would generally go, Hanson's attorney asked him if Shell had ever threatened to cancel his lease. Wolken responded that in 1962 his Shell representative had threatened to cancel his lease "if I didn't do as I was told." Interestingly, the specific dispute from which the threat arose was never revealed and Hanson's attorney never asked that question. It is only speculation that the threat arose over a price controversy. If Hanson is to claim that this threat was an attempt to regulate retail prices, the connection between the threat and a price dispute must be shown. In addition, even though at the heart of his claim, Hanson was unable to get any other examples of suggestively coercive conduct from the largest Shell dealer in Tucson who testified to deviating from the suggested price ten percent of the time. The most that can be drawn from Wolken's testimony to support Hanson is that on a single occasion a local company representative warned a single dealer that his lease might be cancelled over a dispute about an unknown topic. This gives Hanson's claim no support.

Mergard's testimony is no more helpful. He testified that on a single occasion his Shell representative told him that they could enter a "period of better cooperation" if he would get Shell products on the shelves, put price signs up, and follow recommended prices. There was no testimony as to what constituted "bad cooperation" on Shell's part, whether Mergard felt pressured into following the recommended retail price, or whether this was an isolated incident. On cross-examination, however, Mergard said that despite his ignoring the recommended retail price for over a year before his lease renewal date Shell renewed his lease, and that for two years he did not regularly follow the price recommendations. Hanson's reliance on Mergard's testimony that he felt that his "dealer assistance" was often delayed is misplaced as well.[2] Mergard testified that the reason for the delay was Shell's business judgment that the particular trade area did not qualify for such assistance and not an attempt to pressure dealers into price compliance.

■ Both witnesses testified that they were free to post their own prices based on their own business judgment, and that they did in fact always follow that judgment.[3] The directed verdict was proper.[4]

## III. The Directed Verdict on the § 2 Attempt to Monopolize Claim was Proper.

■ Hanson's claim is that Shell's pricing policy was an illegal attempt to monopolize prohibited by § 2 of the Sherman Act. In

**2.** It is curious that Hanson should introduce evidence suggesting Shell often withheld dealer assistance while accusing Shell of using it as a means of predatory price gouging.

**3.** Even had Hanson presented sufficient evidence upon which a jury could have found that Shell attempted to coerce dealers into following the recommended price, his failure to show that any dealers in fact succumbed to this pressure is an additional basis for a directed verdict since without such a showing no connection between Shell's conduct and Hanson's retail business difficulties could be found.

**4.** *Gray v. Shell Oil Co.,* 9 Cir., 1972, 469 F.2d 742, makes it clear that a supplier may suggest retail prices to its dealers and use "persuasion" to get them to adopt the suggested prices. No violation is made out unless plaintiff can show that the supplier's conduct rose to the level of coercion sufficient to deprive the dealers of their free choice. Hanson made no such showing.

his brief, however, Hanson fails to point to any evidence in the record, and fails to provide any legal analysis to support his claim other than to argue that the grounds upon which the trial judge based his directed verdict were improper. Even more extraordinary, however, is Hanson's failure to reveal what part of interstate commerce he believes that Shell was attempting to monopolize. Was it the wholesale or the retail gasoline market? If the wholesale market is the focus of his charge, then a directed verdict was proper because no relationship between Hanson's business failure in the retail market and Shell's alleged attempt to monopolize the wholesale market was shown. If the attempt was to monopolize the retail market, Hanson's case hinges on his ability to show that Shell attempted to control retail prices, a fact which, as we have already noted, Hanson was unable to prove.

Beyond these threshold failures, Hanson also failed to demonstrate anything which could support a finding that one of the essential elements of an illegal § 2 attempt was present. An "attempt to monopolize" requires that acts be performed with the specific intent to monopolize. *See, e. g., American Tobacco Co. v. United States,* 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; *Swift & Co. v. United States,* 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; *Cornwell Quality Tools Co. v. C.T.S. Co., supra,* 446 F.2d at 832.

Hanson presented no evidence which would suggest that the "specific intent" to monopolize existed; he does not even discuss specific intent in his brief. It is true that Shell adopted a new pricing policy in 1961 designed to expand its share of the Western Region market, but this reflects no more than Shell's unwillingness to watch its

market share continue to erode as it had done since 1955. Before the new pricing policy could get Hanson to the jury as a possible attempt to monopolize, Hanson had to establish that the new policy represented "predatory pricing" designed to drive competitors out of the market and establish monopoly benefits for Shell. This he has made no attempt to do.

 To demonstrate predation, Hanson had to show that the prices charged by Shell were such that Shell was foregoing present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses. This could be shown by evidence that Shell was selling its gasoline at below marginal cost or, because marginal cost is often impossible to ascertain, below average variable costs.[5] *See International Air Industries, Inc. v. American Excelsior Co.,* 5 Cir., 1975, 517 F.2d 714, 723–24; Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 1975, 88 Harv.L.Rev. 697, 703–18. Hanson made no effort to prove that the prices Shell was charging at either the wholesale or the retail level were below marginal or average variable costs, and for all that appears Shell's new pricing policies were nothing more than an attempt to gain a larger share of the market because of its stronger competitive position. If its prices were above its costs, and nevertheless Shell's did drive Hanson out of business, this can only be because Hanson was so inefficient that at prices at which Shell could make a reasonable profit he could not. The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in busi-

---

5. An alternative possibility might be a showing that the defendant charged a price which, although above marginal or average variable costs, was below its short run profit-maximizing price and that barriers to entry were great enough to prevent other entry before the predator could reap the benefits of his oligopolistic or monopolistic market position. *See International Air Industries, Inc. v. American Excelsior Co.,* 5 Cir., 1975, 517 F.2d 714, 724. There is

some question, however, whether pricing below a profit maximizing point which is still above marginal and average variable costs should be considered predatory; it only discourages inefficient new entrants who must have higher prices to survive. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 704–09.

ness. The Sherman Act is not a subsidy for inefficiency. Hanson's failure to show that Shell's prices were below its marginal or average variable costs was a failure as a matter of law to present a prima facie case under § 2.[6]

## IV. *The Granting of a New Trial on the § 1 Horizontal Restraint and § 2 Conspiracy Claims was Proper.*

Hanson also charged that Shell and Standard entered into an agreement to avoid competition between themselves and to drive the independent dealers out of business, and that this conduct was a violation of §§ 1 and 2 of the Sherman Act. Although at the first trial the jury returned a verdict for Hanson on these claims in the amount of $363,181.31, the trial court concluded that the verdict was against the weight of the evidence, that the damages were excessive and that his instructions on the damages issue were improper. On these grounds, the court ordered a new trial on both issues. Hanson now argues that this order was error.

▮▮▮ The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co.,* 9 Cir., 1957, 249 F.2d 246, 256. A new trial may also be granted when in his judgment the trial judge finds that the "amount of compensation awarded is excessive." *Murphy v. United States District Court,* 9 Cir., 1944, 145 F.2d 1018, 1020. Absent a showing that the trial court abused its discretion, the order granting a new trial will not be reversed on appeal. *Oswald v. Cruz,* 9 Cir., 1961, 289 F.2d 488. Furthermore, reversal is unwarranted unless the trial court abused its discretion with respect to each ground upon which it based the order;

if any ground is reasonable, the order must be affirmed. *Nuttall v. Reading Co.,* 3 Cir., 1956, 235 F.2d 546, 548. Our review of the record convinces us that the trial court did not abuse its discretion in ordering a new trial on any of the state grounds.

### A. *The Verdict was Against the Weight of the Evidence.*

▮▮▮ Hanson's argument hinges on some documented meetings between Standard and Shell executives at an oil trade association meeting and at other times in San Francisco where their offices are located. When an illegal conspiracy or agreement to restrain trade is charged, there must be evidence from which actual agreement or mutual consent can be found or inferred. *Esco Corp. v. United States,* 9 Cir., 1965, 340 F.2d 1000, 1007-08. Thus, evidence of meetings alone is not sufficient; there must also be evidence sufficient to permit the jury to infer illegal agreement. We agree with the trial judge that the evidence that Hanson offered to show such agreement was so lacking that the verdict against Shell was against the weight of the evidence.

Hanson attempted to show agreement by introducing evidence of parallel pricing behavior on the part of the two oil companies and the willingness of the companies to share price information. His evidence was weak. This court has noted that:

> Similarity of prices in the sale of standardized products . . . will not alone make out a prima facie case of collusive price fixing in violation of the Sherman Act, the reason being that competition will ordinarily cause one producer to charge about the same price that is charged by any other. *Independent Iron Works, Inc. v. U. S. Steel Corp.,* 9 Cir., 1963, 322 F.2d 656, 665.

In fact, the massive volume of evidence comparing prices of various dealers and companies in the Western Region and in

---

6. While proof of pricing below marginal or average variable cost is prerequisite to a prima facie showing of an attempt to monopolize, such a showing, if made, would not show a *per se* violation. There may be nonpredatory and acceptable business reasons for a firm engaging in such pricing. Plaintiff's showing of below-cost pricing merely clears the first hurdle and raises the question of justification.

Tucson showed that Shell's retail prices were paralleled by the prices of the other majors and of independent dealers as frequently as, if not more frequently than, they were by Standard. While wholesale price data were much less complete, there was nothing offered by Hanson to show that Standard and Shell moved with any more consistency with one another than with any other supplier.

Likewise, Hanson's claim that the willingness of the two companies to share wholesale price information demonstrated an agreement is also weak. Unlike *United States v. Container Corp. of America*, 1969, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526, this case does not involve companies exchanging secret price information for the purpose of price stabilization. Here, Shell and Standard were willing to seek and to reveal wholesale price information for the purpose of reducing their prices to retail dealers requesting "dealer assistance" when such aid was appropriate. The information was not secret and was available to anyone requesting it. The goal of either company was not shown to be price stabilization, but rather price reductions in order to help local dealers faced with severe competition. Such exchange of information does not rise to the level of an illegal conspiracy, *see Gray v. Shell Oil Co.*, 9 Cir., 1972, 469 F.2d 742, 746–47, and the trial court did not abuse its discretion in finding that this, coupled with the other scant evidence of illegal agreement, was outweighed by the massive amounts of evidence introduced to show that Shell and Standard were active competitors, not conspirators.

## B. *The Damage Award was Excessive.*

The trial court also found that because the evidence was weak in showing that Shell's pricing policy was a proximate cause of Hanson's financial difficulties, and because the evidence as to Hanson's actual damages was misleading and confusing, a new trial was necessary. Again, we cannot say that this was an abuse of discretion.

Hanson argues that Shell's predatory pricing was the proximate cause of his going out of business, and that Shell should be liable for the full value of the business. Hanson did not, however, produce evidence tying Shell's conduct, or even the price wars that dominated the Tucson market,[7] to his business failure. In fact, the evidence, considered as a whole, points to the opposite conclusion.

■ Long before Shell's new pricing policy, Hanson was pumping quantities of gasoline far below those necessary to survive. His stations were old and dilapidated. He imposed two middlemen between the supplier and dealer, thus having trouble keeping his dealers because the margin that he could offer was too small. He had inadequate supplies of gasoline in a town flooded with it because he had gotten over his dead in debts and lost all of his credit. In short, almost every piece of evidence points to the conclusion that Hanson went broke because of his incompetent and inefficient management. Of all the independent dealers in Tucson during the period in issue, only Hanson was forced out of business, and one such dealer subsequently took over three of Hanson's stations and operated them at a substantial profit despite Shell's alleged war of genocide on the independents. Apparently, only Hanson was affected by the war. The market share of the other independents in Tucson rose from 19.5% in 1962 to 30.4% in 1967, while Shell's market share fell from 10.2% to 9% over the same period. Thus, the jury's finding that Shell's policies were the proximate cause of Hanson's troubles was clearly against the weight of the evidence.[8]

■ In addition, the evidence presented as to the value of Hanson's business was confusing at best and incredible at worst. Hanson admitted that the profit and loss

---

7. Apparently Hanson ties Shell's alleged pricing policy to his problems by claiming that it was this illegal activity which caused the price wars. The testimony, however, is that it was the independents who started the wars.

8. In fact, Hanson's showing was so insubstantial that the trial court's only possible error was its failure to direct a verdict for Shell on all counts at the close of the evidence.

statement for December 1, 1961, to November 30, 1962, upon which he relied heavily, did not reflect the complete profit picture of the business as required in *Wolfe v. National Lead Co.,* 9 Cir., 1955, 225 F.2d 427, 430–31. Likewise, Hanson's testimony that his business was worth $1.00 for every gallon of gasoline sold per month, even if admissible, was mere assertion, and in light of his long term profit picture was, to say the least, unreasonable. The trial court was well within its discretion in granting a new trial based on its belief that the jury was confused by the damage evidence and returned an excessive verdict.

## V. *The Statute of Limitations Issue.*

At the second trial on the claimed Shell-Standard conspiracy, the trial judge instructed the jury:

> You have heard throughout the trial the references to the date December 23, 1964. That date is important to this lawsuit because Plaintiff may recover damages only if you find *that the Defendant committed overt acts in violation of the antitrust laws after December 23, 1964,* and if those acts injured the Plaintiff. I have permitted you to hear evidence as to other matters before December 23, 1964, but such evidence was admitted only as background material which the Plaintiff was permitted to produce for the purpose of attempting to show the origins of alleged conduct which Plaintiff charges occurred after December 23, 1964.
>
> (emphasis added)

Hanson claims that this instruction was in error because of the Supreme Court's decision in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 1971, 401 U.S. 321, 339–40, 91 S.Ct. 795, 28 L.Ed.2d 77. We agree that the instruction was a misstatement of the *Zenith* rule, but the error was harmless.

*Zenith* stands for the proposition that a plaintiff may recover for acts violative of the antitrust laws committed prior to the statute of limitations date, but that he may only recover those damages for such acts which accrued and became ascertainable within the period of the statute. *See* 401

U.S. at 338–42, 91 S.Ct. 795. Thus, the trial court's instruction that the jury had to find an overt illegal act within the period of the statute was in error; Hanson could have recovered damages accruing to him after December 23, 1964, if those damages were not ascertainable before that date and were caused by illegal conduct occurring entirely before that date. Nevertheless, the error was harmless.

First, the trial court did admit all evidence of Shell's pre-December 23, 1964, conduct which Hanson thought was relevant to his case. Hanson alleged, and the evidence showed, that Shell's conduct, and its relationship with Standard, were constant throughout the early 1960's, and until Hanson's business demise in 1966. If Shell were committing illegal acts before the cut-off date, there is no question that it also committed those same acts after that date. The jury heard all of the evidence of both pre- and post-December 23, 1964, conduct, and by failing to find any illegal conduct after that date, it must have also found that there was no illegal conduct before that date. Thus, the instruction was harmless error.

Second, even under the *Zenith* rule, Hanson would have been limited to recovering damages which he suffered after December 23, 1964. The evidence concerning the history of Hanson's business fortunes shows that as early as 1962, Hanson was trying to get out of the business but was unable to find anyone willing to buy him out at any price. His losses were substantial throughout the following years. The only reasonable conclusion that can be drawn is that the value of Hanson's business in December of 1964 was no greater than its value in 1966 when he closed up shop. Thus, whatever damage Shell might have done to Hanson's business as a result of pre-December 23, 1964, conduct had accrued to Hanson before that date, and he may not recover those damages under the *Zenith* rule.

It cannot be said that in the year and a half between December 23, 1964, and the time when Hanson closed his business Shell's earlier conduct cost him lost profits

which was damage not accruing until after the crucial date. Hanson's evidence shows that in the entire fourteen-year history of his business, there was not one year in which he showed a profit, and in only three years did he make enough to cover even part of the value of his own time and services. The evidence does not support the notion that Shell's conspiracy with Standard, which Hanson alleges began in 1961, caused him to lose profits in the last year and a half of a business which never made a profit in its entire history dating back to 1952. Hanson's losses were no greater after the alleged conspiracy began than before.[9]

### VI. The Court did not Err in Excluding the Lundberg Surveys.

 The court excluded from evidence the Lundberg Surveys, periodic price listings of the retail prices of gasoline in a given area at a given time. Hanson argues that the survey was admissible under the exception to the hearsay rule permitting market reports and price listings relied on in the industry to be admitted under the assumption that they are reliable. See Commonwealth of Virginia v. State of West Virginia, 1951, 238 U.S. 202, 212, 35 S.Ct. 795, 59 L.Ed. 1272. However, the trial judge had sound grounds upon which to exclude the surveys from evidence.

The trial court may reject unreliable price information. Herzog v. United States, 9 Cir., 1955, 226 F.2d 561, 564. In this case there is ample evidence upon which the trial court could base a finding of unreliability. While there is a showing that the survey was relied upon in the industry, the evidence is that it was relied upon only for the purpose of discerning general price trends, and not for the specific day-to-day pump prices upon which Hanson wanted to rely. The trial judge's determination that the day-to-day prices in the survey had not

been shown to be reliable was proper grounds for his excluding the evidence.

Hanson also sought to introduce the survey to show that Shell's and Standard's pricing paralleled each other. As we have seen, even if Hanson could establish closely parallel pricing patterns between the two brands, in an industry where prices are likely to be similar, such evidence does little to establish an illegal conspiracy. Thus, exclusion of evidence which would show parallel pricing would be harmless to the plaintiff. Moreover, we have held that the trial court properly directed a verdict in favor of Shell on the issue of vertical retail price maintenance. If Shell did not control the retail price at which its dealers sold gasoline, evidence of the retail price would show nothing material about Shell's behavior. Thus, because of Hanson's failure to show that the suppliers controlled retail prices, excluding evidence of retail prices was also harmless.

### VII. Summary.

We hold that the trial court properly directed a verdict for Shell on the Sherman Act § 1 charge of vertical combination in restraint of trade and § 2 charge of attempt to monopolize. We also hold that the trial court acted well within its discretion in granting a new trial on the Sherman Act § 1 horizontal combination in restraint of trade and § 2 conspiracy to monopolize charges. We further hold that, although the instruction on the statute of limitations during the second trial was in error, the error was harmless. Finally, we hold that the trial court properly refused to admit the Lundberg Survey in evidence.

Affirmed in all respects.

EUGENE A. WRIGHT, Circuit Judge (concurring):

I concur, but would prefer to dispose of the appeal on the basis that the plaintiff in

---

**9.** Hanson's argument that the full amount of his damages over the entire life of the conspiracy were not ascertainable until he went out of business can be rejected out of hand. What this argument implies is that efficient and hard-working independent dealers who make a profit despite illegal conspiracies directed against them have no remedy, but incompetents who are forced out of business can recover, trebled, all losses ever suffered.

this private antitrust action should fail because he has not established the necessary "reasonable probability" of some causal connection between the defendant's wrongful act and some injury to the plaintiff. *Flintkote v. Lysfjord,* 246 F.2d 368, 392 (9th Cir. 1957). *See also Pacific Coast Agricultural Export Ass'n v. Sunkist,* 526 F.2d 1196, 1205–06 (9th Cir. 1975); *Gray v. Shell Oil Co.,* 469 F.2d 742, 749 (9th Cir. 1972); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 52 (9th Cir. 1971).