**ILC PERIPHERALS LEASING CORPORATION, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**MEMOREX CORPORATION, MRX Sales and Service Corporation, Plaintiffs,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**Nos. C–73–2238 SC, C–73–2239 SC.**

United States District Court, N. D. California.

Aug. 11, 1978.

John L. Endicott, Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiffs.

Patrick Lynch, O'Melveny & Myers, Los Angeles, Cal., for defendant.

## ORDER

CONTI, District Judge.

The jury in the trial of this action was asked to decide whether IBM monopolized or attempted to monopolize various markets in the computer industry. After five months of trial, and after the jury reported itself deadlocked, the court declared a mistrial.

IBM has moved this court for a directed verdict on the grounds that no reasonable jury could find for Memorex on any of its contentions. The court now entertains this motion.

The court, in ruling on IBM's motion for a directed verdict, will discuss the issues and evidence and analyze the same by dividing them into four categories. These are:

 (I) MARKETS AND MONOPOLY POWER;
 (II) PRICING;
 (III) DAMAGES;
 (IV) ACTS:

 (1) Interface disclosure;
 (2) The Fixed Term Plan;
 (3) 2319A and 2319B disk drives;
 (4) The New Attachment Strategy;
 (5) 3705 Communications Control Units;
 (6) System/370 Models 112 and 125.

## I. MARKETS AND MONOPOLY POWER:

One element of the offense of monopolization is the possession of monopoly power in a relevant market or submarket. *United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). By agreement of the parties in this case, an element of the offense of attempt to monopolize is the specific intent to possess monopoly power in a relevant market or submarket. Memorex offered evidence to establish the following markets: (1) general purpose computer systems; (2) IBM plug compatible disk drives; (3) IBM plug compatible disk drive control units; and (4) IBM plug compatible communications control units. IBM contends that Memorex has failed to satisfy its burden of proving that any of these markets is a relevant market or submarket as those terms are defined by the antitrust laws.[1]

In *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264 (9th Cir. 1975), the Ninth Circuit discussed

---

1. The parties agreed that the relevant geographic market is the United States. Their disagreement was over the definition of the relevant product market.

relevant market at length. An excerpt from this opinion follows:

The proper point of departure in any discussion of the relevant product market must be the rule of "reasonable interchangeability," enunciated in *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 . . . (1956). According to the Court,

In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of trade or commerce", monopolization of which may be illegal.

That is, where there is a high degree of *substitutability in the use* of two commodities, it may be said that the crosselasticity of demand between them is relatively high, and therefore the two should be considered in the same market. A like analysis applies when the market is viewed from the production rather than the consumption standpoint; the degree of substitutability in production is measured by cross-elasticity of supply. Substitutability in production refers to the ability of firms in a given line of commerce to turn their productive facilities toward the production of commodities in another line because of similarities in technology between them. Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market. While the majority of the decided cases in which the rule of reasonable interchangeability is employed deal with the "use" side of the market, the courts have not been unaware of the importance of substitutability on the "production" side as well. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 n. 42 [82 S.Ct. 1502, 8 L.Ed.2d 510] . . . (1962); *United States v. Columbia Steel Co.,* 334 U.S. 495, 510–11 [68 S.Ct. 1107, 92 L.Ed. 1533] . . . (1948). [Emphasis by the court.]

*See also, Greyhound Computer Corp., Inc. v. International Business Machines Co.,* 559 F.2d 488, 493 n. 4 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). The two important factors to consider in defining the relevant product market are, therefore, substitutability in the use and substitutability in production of commodities.

In *United States v. Grinnell Corp., supra,* 384 U.S. at 572, 86 S.Ct. at 1704, the Supreme Court indicated that "[i]n § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act (*Brown Shoe Co. v. United States,* 370 U.S. 294, 325 [82 S.Ct. 1502, 8 L.Ed.2d 510] . . .) there may be submarkets that are separate economic entities." In *Brown Shoe Co. of United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the Supreme Court discussed submarkets:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 593–595, 77 S.Ct. 872, 1 L.Ed.2d 1057 . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

The submarket issue was cast by the Ninth Circuit in *Greyhound Computer Corp., Inc. v. International Business Machines Co., supra,* 559 F.2d at 493, in the following terms:

The question is whether [plaintiff] offered evidence from which the jury could have reasonably concluded that the submarkets which [plaintiff] defined were sufficiently distinct in commercial reality

to permit a company that dominated these submarkets to exclude competition and control prices.

Thus, the primary concern in the submarket context is still whether domination of the product market or markets defined by the plaintiff would enable the defendant to control prices and exclude competition. This inquiry boils down to whether there are products that restrain a defendant's ability to act without regard for other manufacturers and suppliers.

■ The first market defined by Memorex is the general purpose computer systems market. IBM contends that this market is too narrow because it excludes products such as minicomputers and programmable communications control units and terminals, and because it excludes competitors such as software suppliers, leasing companies, and service organizations. IBM further contends that the reason this market is too narrow is that Memorex's market expert relied on an inaccurate source of market information.

IBM offered evidence that a reasonable alternative to a central processing unit is a series of minicomputers. As minicomputers have improved, a number of large companies and organizations have adopted this alternative. Minicomputers can also be used to supplement a central processing unit. In addition, where a user's computing needs are not all at one location, programmable communications control units and terminals can link and supplement a series of minicomputers or a central processing unit. Leasing companies, which purchase computer equipment from manufacturers and lease it to users, are an alternative source of all kinds of computer equipment for all kinds of users. Finally, service bureaus that sell computer time or specific functions such as payroll offer another non-manufacturer option. Exclusion of these alternative products and services weighs against Memorex's general purpose computer systems market.

The evidence indicates that Memorex's market expert's primary source of information for this market was IBM's COMSTAT categories. COMSTAT was an internal IBM reporting procedure designed to assist in product development and marketing, not to measure competition. The usefulness of this data was questioned by IBM even before this litigation started, and also by a staff member of Memorex's market expert. Other sources of information were available, and while they were used to make adjustments in the COMSTAT data, the use of the COMSTAT categories colors the accuracy of this market definition. The court concludes that Memorex has not satisfied its burden of proving that the general purpose computer systems market is a relevant market or submarket both because it excludes reasonable alternative products and services and because the accuracy of the underlying market information is questionable.

■ Memorex also defined three IBM plug compatible product markets. The parties' agreed definition of a plug compatible product is "a device which can be used in place of another device without substantial electronic, mechanical or programming modifications and without significant change in the operation of the computer system." What this means in this case is that a Memorex disk drive, disk drive control unit, or communications control unit can replace the comparable IBM product in a system using an IBM central processing unit. IBM contends that these plug compatible markets are too narrow because they exclude other storage devices such as tape drives and main memory, because they exclude comparable products manufactured for use on non-IBM systems, and because they exclude systems of other systems manufacturers.

These three plug compatible markets include only disk drives, disk drive control units, and communications control units manufactured by IBM and replacements for these products manufactured by Memorex and others. Before examining these product markets more closely, some general comments are in order. In *United States v. E. I. du Pont de Nemours & Co., supra,* the Government attempted to limit the market to a single product, cellophane, which was

manufactured by du Pont and one other company that was a licensee of du Pont patents. In affirming the district court's rejection of this market, the Supreme Court said:

> [O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

351 U.S. at 393, 76 S.Ct. at 1006.

The Court continued later in its decision:

> [W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be part of the market. To accept the Government's argument, we would have to conclude that the manufacturers of plain as well as moisture-proof cellophane were monopolists, and so with films such as Pliofilm, foil, glassine, polyethylene, and Saran, for each of these wrapping materials is distinguishable. These were all exhibits in the case. New wrappings appear, generally similar to cellophane, is each a monopoly? What is called for is an appraisal of the "cross-elasticity" of demand in the trade.

*Id.* at 394, 76 S.Ct. at 1006.

The same problem the Supreme Court found with the cellophane market exists in this case because there are or could be comparable plug compatible markets for the other systems manufacturers. A market definition that would inevitably lead to so many monopolies should be carefully scrutinized.

After considering the evidence, the court concludes that Memorex has not satisfied its burden of proving that the three IBM plug compatible markets are relevant markets or submarkets because they exclude reasonable alternative products. The court finds that Memorex improperly disregarded the existence of competition from alternative storage media. While there may be situations where disk storage is the only practicable medium, there are many other situations where either tape or memory are reasonable alternatives. The decision is influenced by the price/performance ratios of the available options. Thus, these other storage media restrain the price IBM can charge for disk drives and disk drive control units.

The second restraint on IBM's disk drives, disk drive control units, and also on communications control units is potential competition from manufacturers of comparable non-IBM plug compatible products. These include plug compatible manufacturers who market their products to end users of non-IBM systems, original equipment manufacturers who market their products to other systems manufacturers for inclusion in their systems, and other systems manufacturers themselves. Memorex contended that the cost of modifying an interface precluded competition between IBM compatible and non-IBM compatible products. However, IBM demonstrated that the conversion cost was within the means of even small manufacturers and that the engineering difficulties were manageable. It also offered evidence of interface modifications that had been made at its request and by others.

Finally, the IBM plug compatible product markets ignore the importance of prices for peripheral products in the choice of a system. Peripheral products are devices, including disk drives, disk drive control units, and communications control units, that are outside the central processing unit. These devices have become an increasingly large part of the cost of a system. The higher their prices, the greater the cost of a system, and the less competitive the system is with the systems of other manufacturers. Competition between systems is, therefore, an important restraint on IBM's prices for disk drives, disk drive control units, and communications control units.

There are additional difficulties with the IBM plug compatible disk drive control unit and communications control unit markets. Disk drives and disk drive control units have been marketed as a subsystem by plug compatible manufacturers, including Memorex. In such circumstances, it is doubtful whether a separate market for disk drive control units even exists. With respect to the communications control unit market, there is insufficient evidence to show that such a market exists. Memorex's market expert specifically excluded this market from his testimony, and the few documents offered in support of this market were inconclusive.

For the reasons indicated above, the court concludes that viewing the evidence as a whole, there is not substantial evidence present that could support a finding by reasonable jurors that Memorex has satisfied its burden of proving that the markets it defined are relevant markets or submarkets for antitrust purposes. As the Ninth Circuit said in evaluating monopolization claims under Section 7 of the Clayton Act and Section 2 of the Sherman Act, "Plaintiffs' contentions must fail because of their failure adequately to define and prove the relevant market which is 'a necessary predicate' for evaluating claims under these provisions of the antitrust laws." *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296 at 1301 (9th Cir. 1978). It is hereby ordered that IBM's motion for a directed verdict on this ground is granted.[2]

■ IBM further argues that even assuming the validity of these market definitions, Memorex has failed to satisfy its burden of proving that IBM possessed monopoly power in these markets. Monopoly power is defined as the power to control prices or exclude competition. *United States v. E. I. du Pont de Nemours & Co., supra,* 351 U.S. at 391, 76 S.Ct. 994. In *United States v. Grinnell Corp., supra,* 384 U.S. at 571, 86 S.Ct. at 1704, the Supreme Court indicated that "[t]he existence of such power ordinar-

ily may be inferred from the predominant share of the market." However, in *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), the Ninth Circuit stated that "it is now well settled that market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power." IBM contends that the evidence precludes an inference of monopoly power from its market share, and that the evidence affirmatively demonstrates the absence of monopoly power.

In *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945), Judge Learned Hand said, "The percentage we have already mentioned—over ninety —. . . is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." Because market share does not alone determine the presence or absence of monopoly power, neither the Supreme Court nor the Ninth Circuit has been able to improve on these guidelines during the more than thirty years since that case was decided. *See Greyhound Computer Corp., Inc. v. International Business Machines Co., supra,* at 496 n. 18. However, the court in *Greyhound* indicated another factor to be considered:

The record indicates that IBM's market share is declining. A declining market may reflect an absence of market power, but it does not foreclose a finding of such power. *Id.* [Citations omitted.]

In this case, Memorex offered evidence of relatively high IBM market shares, but even this evidence indicates that its shares were declining.

■ Because the court feels that Memorex's market share evidence is inaccurate, no extended discussion of the effect of these shares is necessary. Memorex's market expert stated that he used installed base figures to calculate IBM's market

---

2. By agreement of the parties, this failure of proof affects the attempt to monopolize claim as well as the monopolization claim.

shares. Installed base figures attribute all products IBM has ever manufactured to its shares, regardless of who owns the products. Thus, these figures lump past manufacturers with present, and include products over which IBM no longer has any pricing discretion. To determine a firm's monopoly power as of a given date, its current market share is the relevant figure and is normally measured in terms of current output. *See* P. Areeda & D. Turner, *Antitrust Law* ¶ 520, at 350 (1978). Memorex's market expert conceded that current output figures are normally used, and offered no convincing reason for treating these markets differently. He also conceded that exclusion of products sold by IBM in earlier years would reduce its market shares. Monopoly power should not be inferred from such questionable evidence.

■ There was also considerable evidence that regardless of IBM's market shares, it lacked the power to control prices or exclude competition in these markets. Both competitors and customers of IBM in the computer industry stated that the industry is extremely competitive. In addition, IBM was forced to lower its prices on numerous occasions to prevent plug compatible manufacturers from squeezing it out of these markets entirely. A substantial number of new competitors entered these markets and the degree of product innovation is high. Viewing this evidence as a whole, the court concludes that there is not substantial evidence present that could support a finding by reasonable jurors that Memorex has satisfied its burden of proving that IBM possessed monopoly power in the markets it defined. It is hereby ordered that IBM's motion for a directed verdict on this ground is granted.[3]

## II. *PRICING*:

Memorex challenged the prices at which IBM sold a number of its products. IBM has argued throughout this litigation that prices may be predatory only when they are below marginal or average variable cost. Memorex concedes that it made no effort to

prove that IBM's prices were below this level, so, if IBM is correct about the standard to be applied, the court should direct a verdict in its favor on the pricing issues. Even under the standard proposed by the court, IBM contends that it reduced prices to meet lower prices of its competitors, and that Memorex has failed to satisfy its burden of proving that IBM was sacrificing present profits to obtain supranormal profits in the future.

■ In *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), the Ninth Circuit discussed predatory pricing. An excerpt from this opinion follows:

> To demonstrate predation, Hanson had to show that the prices charged by Shell were such that Shell was foregoing present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses. This could be shown by evidence that Shell was selling its gasoline at below marginal cost or, because marginal cost is often impossible to ascertain, below average variable cost.[5]
>
> [5 An alternative possibility might be a showing that the defendant charged a price which, although above marginal or average variable costs, was below its short run profit-maximizing price and that barriers to entry were great enough to prevent other entry before the predator could reap the benefits of his oligopolistic or monopolistic market position. There is some question, however, whether pricing below a profit maximizing point which is still above marginal and average variable costs should be considered predatory; it only discourages inefficient new entrants who must have higher prices to survive.]
>
> Hanson made no effort to prove that the prices Shell was charging at either the wholesale or the retail level were below marginal or average variable costs, and for all that appears Shell's new pricing policies were nothing more than an attempt to gain a larger share of the market because of its stronger competitive position. If its prices were above its costs, and nevertheless Shell's did drive Hanson out of business, this can only be

**3.** This failure of proof affects only the monopolization claim.

because Hanson was so inefficient that at prices at which Shell could make a reasonable profit he could not. The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business. The Sherman Act is not a subsidy for inefficiency. Hanson's failure to show that Shell's prices were below its marginal or average variable costs was a failure as a matter of law to present a prima facie case under § 2.

*Id.* at 1358–59. [Citations omitted.]

The court interprets this case as establishing two tests for predatory pricing: (1) pricing below marginal or average variable costs, and (2) pricing above marginal or average variable costs but below the short run profit-maximizing price where barriers to entry are high. Hanson lost because he failed to satisfy the first test. There is no indication that he offered any evidence that would have invoked the second.

The court in *Hanson* cited *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 723–24 (5th Cir. 1975), to support this dual test. In that case, plaintiffs argued that the district court should have directed a verdict in its favor on its Robinson-Patman Act price discrimination claim. The Fifth Circuit indicated that the basic substantive issues raised by the Robinson-Patman Act and the Sherman Act were identical. In affirming the lower court's refusal to direct a verdict for plaintiffs, the Fifth Circuit said, "When price discrimination exists—as in the case before us—we see no reason to depart from the average variable cost test for predation unless it can be shown that there are significant barriers of entry in the relevant market." *Id.* at 724. The court expanded on this statement in a footnote:

> We employ the profit maximizing standard only because of our deference to a situation in which a monopolist could drive a slightly less efficient firm out of the market by charging a price above its own average cost, but then charge a very high price because of the difficulty of

new entry. This standard should be applied only when the barriers to entry are extremely high. The lower the barriers to entry to a market, the closer to marginal cost a monopolist would have to set its price in order for a plaintiff to prevail as a matter of law, for we see no social utility in insuring the survival of inefficient firms where a new entry is possible.

*Id.* at 724–25, n. 31.

As the court noted, "If a discriminator's price in the competitive market increases his new revenues in the short run, he will have no need to 'subsidize' losses in the competitive market with the profit from his other market." *Id.* at 725. While these comments were made in the context of a price discrimination claim, they are equally applicable to Memorex's theory of price balancing. Price balancing is defined by Memorex as lowering prices for a product in a competitive market and at the same time raising prices for a different product in a market without substantial competition. The second test for predatory pricing should be applied only in the limited circumstances described above, and should probably be considered an exception to the marginal or average variable cost test rather than an independent test itself.

The Ninth Circuit recently discussed predatory pricing again in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977). The court said, "As implied in *Hanson*, an across-the-board price set at or above marginal cost should not *ordinarily* form the basis for an antitrust violation." *Id.* at 857. [Emphasis added.] This statement indicates that the exception for a market with high barriers to entry is still recognized. The court added, "[A]s stated in *Hanson*, average variable cost can be used as evidence of marginal cost." *Id.* at 858. In affirming the district court's direction of a verdict in favor of American, the Ninth Circuit concluded:

> On the basis of the present record, and even assuming that the products were sold at the prices indicated on the price list, Janich has not come forth with sufficient evidence to go to the jury on a

contention that American sold gin and vodka below average variable cost for the period 1961–62. *Id.*

As was the case in · *Hanson,* there is no indication that Janich offered any evidence that barriers to entry in the relevant market were high.

Memorex concedes that it offered no evidence that any of IBM's prices were below its marginal or average variable costs. Thus, Memorex did not satisfy the first test for predatory pricing set forth in *Hanson.* Memorex did offer evidence that the barriers to entry in the markets it defined were high, attempting to invoke the second test or the exception to the marginal or average variable cost test from *Hanson.* IBM contends that Memorex has failed to satisfy its burden of proving that the barriers to entry in these markets were high or that IBM's prices were below its short run profit-maximizing prices. IBM further contends that it reduced prices to meet lower prices of its competitors.

■ The "meeting competition" defense is similar to a statutorily recognized defense to a price discrimination charge under the Robinson-Patman Act. *See* 15 U.S.C. § 13(b). A company should not be guilty of predatory pricing, regardless of its costs, when it reduces prices to meet lower prices already being charged by its competitors. To force a company to maintain non-competitive prices would be to turn the antitrust laws on their head. Such a price cut cannot create the kind of market position that the prohibition of predatory pricing was meant to preclude. The evidence in this case indicates that IBM's prices for the 2319 disk drives, the Fixed Term Lease Plan, and the 3705 communications control unit were set at a level established by Memorex and the other plug compatible manufacturers. In fact, IBM's prices were higher in most instances even after the reductions. Memorex will not be heard to complain that they should have been still higher so that it could take even more business away from IBM.

To satisfy the second test or the exception to the marginal or average variable cost test from *Hanson,* Memorex had to prove that IBM was sacrificing present profits to obtain supranormal profits in the future. If IBM were able to force the plug compatible manufacturers out of the markets defined by Memorex, it would still face competition from leasing companies and other systems manufacturers. However, even discounting the importance of this check, Memorex had to show that IBM's prices were below its short run profit-maximizing prices and that barriers to entry in these markets were high.

■ The court in *International Air Industries, Inc. v. American Excelsior Co., supra,* indicated that this second test or exception to the first should only be used when the barriers to entry were "extremely high." The evidence in this case indicates that entry into the markets defined by Memorex was not overly difficult. Memorex itself made the change over from original equipment to plug compatible manufacturer very quickly. Other companies have been able to enter the plug compatible markets directly, and systems manufacturers have also entered with relative ease. In these circumstances, IBM had little prospect of future gain by undercutting its current competitors.

Finally, Memorex has not offered any convincing evidence that any of IBM's prices were not considered to be short run profit-maximizing when they were adopted. There is some testimony from a Memorex expert that a few of the thousands of possible configurations of the 3705 communications control unit were priced below IBM's total costs. However, IBM successfully impeached this after-the-fact analysis, and in *Janich Bros., Inc. v. American Distilling Co., supra,* at 856–57, the court indicated that the proper focus is on the product line as a whole. The evidence on IBM's other product prices does not even speak to their short-run profitability.

For the reasons indicated above, the court concludes that viewing the evidence as a whole, there is not substantial evidence present that could support a finding by

reasonable jurors that the prices for any of IBM's products were predatory. Memorex did not even try to satisfy the first test for predatory pricing from *Hanson*, and it failed to satisfy the second or the exception to the first. The tests are the same even if evidence of price discrimination or price balancing is offered. In addition, even if its prices were below the levels established by these tests, IBM has established the meeting competition defense. It is hereby ordered that IBM's motion for a directed verdict on this ground is granted.[4]

## III. *DAMAGES*:

In its final damage claim, Memorex sought to recover $306,580,000 for injuries suffered as a result of IBM's alleged antitrust violations.[5] Memorex calculated its damages by measuring the difference between forecasted and actual results for certain of its products. IBM contends that Memorex's proof on its damage claim was fatally speculative. Because damages were not related to individual IBM acts, IBM asserts that there was no reasonable basis in fact for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful. IBM also asserts that Memorex improperly attributed all of its shortfall in anticipated revenues to IBM's alleged antitrust violations despite the presence of other adverse factors.

In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), the Supreme Court indicated that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." The Ninth Circuit expressed the same idea in *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393–94 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), where it said:

We recognize the fact that as we examine this feature of the case, injured plaintiffs and a wrongdoing defendant face the court. In such a context the record will not ordinarily be searched with a microscopic eye. Yet something better is required to sustain a jury verdict than an interested guess.

IBM argues that a jury verdict based on the evidence offered by Memorex on its damage claim in this case would be no more than a guess.

According to IBM, Memorex's damage evidence was defective because it did not provide any means for determining how much Memorex was injured by any IBM act considered by itself. Memorex's damage expert professed to be unable to isolate the impact of each act. However, IBM offered evidence, and the court concludes, that there were alternatives to these lump sum figures. Adjustments to Memorex's pre-impact forecasts after each IBM act would have given the jury a reasonable measure of the impact of that act. Memorex was able to make after-the-fact adjustments in its pre-impact forecasts where this was necessary to increase its damage claim. The way Memorex structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful. Thus, if one of IBM's acts was not a violation of the antitrust laws, much of the damage claim would become invalid. In addition, even if the jury found IBM guilty of every violation alleged, there was no basis for it to independently evaluate what the separate effect of each violation was. It would have to take Memorex at its word. In either case, a verdict rendered on the damage evidence offered by Memorex would have been speculative.

---

4. As will be discussed more fully below in the section on damages, Memorex has structured its damage claim in such a way that it is impossible to separate the injury it suffered from IBM's pricing practices from the injury it suffered from IBM's other acts. The court's ruling on the pricing issues is, therefore, dispositive of the entire action.

5. As originally presented, the Memorex damage claim was $333,345,000. Subtracting damages for the Madrid claim on which the court has already directed a verdict in favor of IBM leaves $306,580,000.

Memorex's damage expert stated that its damage claim had not been adjusted to take account of adverse factors other than IBM's alleged antitrust violations. Although another Memorex witness testified that the effect of these factors was implicit in at least some of Memorex's forecasts, the jury would have had to take Memorex at its word that their influence was properly reflected. In *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. at 579, the Supreme Court said:

> . . . [I]n the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes,* that the defendants' wrongful acts had caused damage to the plaintiffs. [Emphasis added.]

IBM offered evidence of a number of factors other than its allegedly illegal conduct that had an adverse effect on Memorex's operations during the relevant time period. These include: (1) Memorex's own mismanagement and the failure of other portions of its business to perform up to expectations; (2) adverse comment on Memorex in the financial community; (3) the recession in the early 1970's; (4) competition from other companies; and (5) lawful competition from IBM. Because Memorex failed to explain away the effect of any of these factors, the court concludes that a jury verdict rendered on Memorex's damage evidence would have been speculative.

Memorex conceded that it had management problems in the early 1970's. In *Capra, Inc. v. Ward Foods, Inc.,* 536 F.2d 39, 52 (5th Cir. 1976), the court said:

> In addition to *presuming* the accuracy of both [financial] statements, [the Jacks Report] *assumed* out any effect of poor management. The proposition is elementary that estimates and opinions may be based upon assumptions, *but only so long as* the assumptions rest on adequate data. Here the ultimate conclusion was taken as "given". The award is bereft of evi-

dentiary support; it accordingly fails. [Emphasis by the court.]

The damage evidence offered by Memorex suffered from the same defect. There is also evidence in the record that other portions of Memorex's business failed to achieve projected results. These shortfalls may have had a carry-over effect in the markets where Memorex competed with IBM, especially in the systems market where Memorex was in desperate need of capital. Memorex's management problems had a public relations aspect as well. Their exposure in the financial press affected Memorex's ability to raise money.

Memorex did not dispute the fact that there was a recession in the early 1970's. Industry conditions were considered an important factor in the calculation of damages by the Ninth Circuit in *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 284 F.2d 1, 31, 33 (9th Cir. 1960), *rev'd on other grounds,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962). The condition of the overall economy should be no less important a factor. Memorex offered no evidence of the effect of the recession on its operations and hence its damage claim.

Memorex also focused on IBM's alleged antitrust violations to the exclusion of competition from other plug compatible manufacturers. Its own salesmen were warning that Memorex was in a position to lose business to these competitors for the same reason that it was able to take business away from IBM. Their prices were lower. The court in *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 184 F.Supp. 440, 447 (E.D.Pa.1960), indicated that competition from third parties was a factor the plaintiff should take into account. Memorex has not done so in its damage claim. In addition, during the relevant time period, IBM introduced a number of products in the markets defined by Memorex as to which no challenge is made. Failure to separate out the effect of lawful from unlawful competition was a factor in the Second Circuit's affirmation of the dis-

trict court's exclusion of plaintiff's damage evidence in *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911 (2d Cir.), *cert. denied,* 369 U.S. 856, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

In addition to arguing that failure to explain away the effect of these five factors made it impossible for the jury to independently assess the extent of damage Memorex suffered as a result of IBM's alleged antitrust violations, IBM also asserts that there were erroneous assumptions in Memorex's forecasts. First, IBM argues that the 1270 communications control unit forecast was based on certain features being available at specified dates, and that when these features were not delivered on time, the attractiveness of the Memorex product was reduced. The 1270 forecast also assumed that there would be no competitive response like the 3705 from IBM. Second, the systems forecast assumed a substantial mix of Memorex/50's while the overwhelming percentage of Memorex computers actually placed were Memorex/40's. Third, the 660 disk drive forecast depended on the assumption that only 2314-type disk drives would be attached to the IBM System/370 Models 135 and 145 computers, when IBM predicted that more than half of its customers would use the 3330 disk drive. Memorex made no effort to adjust these forecasts to reflect the results of actual experience, yet it was able to adjust its 1270 forecast upward when the product exceeded its earlier projections.

In *Herman Schwabe, Inc. v. United Shoe Machinery Corp., supra,* 297 F.2d at 912, the Second Circuit cautioned that courts must carefully evaluate damage evidence where plaintiff offers

> . . . an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it. It might indeed have been possible for a judge, with days in which to study the exhibits of plaintiff's expert, to come up with some rational computation of damages, on a theory wholly different from what the expert advocated, that would

satisfy the Supreme Court's modest requirements in this area; it would be foolhardy to expect a jury to do so.

For the reasons indicated above, the court concludes that viewing the evidence as a whole, there is not substantial damage evidence present on which reasonable jurors could base a verdict for Memorex that would not be speculation or guesswork. An injured plaintiff need not show the amount of his damages with precision, but he must provide the jury with a theory of recovery that is both reasonable and the best measure available. Memorex has not done so in this case.

It is hereby ordered that IBM's motion for a directed verdict on this ground is granted.

## IV. *ACTS*:

Memorex challenged a number of IBM acts on a number of grounds. These acts include: (1) not disclosing interface information until first customer shipment of a product; (2) the introduction of the Fixed Term Plan; (3) the introduction of the 2319A and 2319B disk drives; (4) the introduction of the New Attachment Strategy; (5) the announcement of the 3705 communications control unit; and (6) the announcement of the System/370 Models 125 and 115. Memorex claims that this conduct was anticompetitive and predatory and unnecessarily excluded competition. *Greyhound Computer Corp. Inc. v. International Business Machines Co., supra,* at 498. IBM contends that these acts were nothing more than reasonable responses to competition. *Id.* at 498–99. The court will discuss each of these acts in turn.

### (1) *INTERFACE DISCLOSURE:*

Memorex challenged IBM's policy of not disclosing interface information until first customer shipment of its products. Memorex claimed that plug compatible manufacturers needed this information at the time of product announcement in order to compete with IBM. IBM contends that it had no duty to disclose interface information, and that what Memorex sought was

more than just the physical description of the interconnections between IBM products.

The parties agreed definition of an interface is

A shared boundary which enables transfer of information in accord with a prescribed format, sequence, timing and encoding. An interface may refer to either hardware or software or a combination of both.

At trial, Memorex used the analogy of an electric plug and a wall socket to describe the physical interconnections between the component devices in a computer system. IBM argues that the mechanical, electrical, and logical information which Memorex sought makes this analogy an oversimplification. While the physical description of an electric plug reveals very little about the nature of the device at the end of the cord, the same is not true of a computer "plug." IBM offered evidence, and the court concludes, that the kind of information Memorex sought would reveal valuable information about the design of the products involved.

Memorex conceded that IBM's disclosure policy was as forthcoming as any in the industry, including its own. In point of fact, interface information is never disclosed as such, but rather is gleaned from maintenance manuals that are published for and distributed with each product. IBM argues that this information is a trade secret, and that it needs the lead time created by not disclosing this information until first customer shipment to recover its product development costs. In *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the Supreme Court held that state trade secret protection is not pre-empted by the federal patent laws. The Court indicated that one of the stated policies behind trade secret law was "the encouragement of invention." *Id.* at 481, 94 S.Ct. 1879. It emphasized that just because a discovery might not be patentable did not " 'destroy the value of the discovery to one who makes it, or advantage the competitor who . . . obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer.' " *Id.* at 482, 94 S.Ct. at 1886. The Court recognized that "[a] trade secret, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture." *Id.* at 476, 94 S.Ct. at 1883.

IBM argues that Memorex should be limited to reverse engineering its interfaces with the help of the maintenance manuals. Memorex contends that it should have access to this information at the time of product announcement under some sort of licensing arrangement. It cited no authority in support of its position, but even if it could, the court concludes that Memorex has not shown that it and other plug compatible manufacturers cannot compete with IBM under present circumstances. Memorex's replacements for IBM products have been profitable, and as its own technical capabilities have improved, it has been able to reduce IBM's lead time considerably. The same is true of other competitors who have continued to enter the plug compatible markets. Depriving IBM of its lead time would remove its incentive to invent.

## (2) *THE FIXED TERM PLAN:*

Prior to the introduction of the Fixed Term Plan (FTP) in May 1971, IBM only leased its peripheral equipment for 30 days. These 30-day leases put IBM at a competitive disadvantage because most of its competitors, including systems and plug compatible manufacturers and leasing companies, offered longer term leases at a discount. In addition, there was a recession in 1970–71 which caused computer users to cut back the amount of equipment they had on lease. IBM equipment on 30-day lease was more easily discontinued than competitive equipment. Both IBM and its competitors recognized that if IBM did not respond to this competition, it would be forced out of the peripheral equipment markets.

FTP gave customers the option of leasing certain IBM peripheral equipment for one

year at an 8% discount or two years at a 16% discount. Memorex asserts that FTP was an illegal price cut. As discussed above in the section on pricing, Memorex did not allege that FTP prices were below marginal or average variable cost. Rather, it asserts that IBM expected its revenues and profits from the products covered by FTP to decrease during the first 18 months of the program. However, there is no evidence that the overall profitability of the program depended on later price increases to recoup present losses. IBM offered evidence that its FTP revenues and profits would increase over time as a result of additional placements and extended product lives. The traditional object of a price cut is to make up lost profits per unit with increased volume, and the court concludes that this is what IBM was attempting to do with FTP. The fact that this price cut took place in a lease context where profitability depends on both the lease rate and the revenue-producing life of a product should not be allowed to cloud the issue.

Memorex also asserts that the one and two year leases locked out IBM's competitors during the term of the lease. In addition to the fact that these competitors offered even longer term leases and the fact that IBM still offered customers the option of a 30-day lease, the FTP lease terms were not so long as to have any significant lockout effect. *See United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (approving five-year lease terms). In *Greyhound Computer Corp., Inc. v. International Business Machines Co., supra,* at 498–99, the Ninth Circuit held that as to FTP, "Greyhound failed to show that IBM's action with respect to peripheral equipment was anything more than a reasonable response to competition." The court concludes that Memorex's proof suffers from the same failure.

(3) *THE 2319A and 2319B DISK DRIVES:*

The 2319A was a 3-spindle version of the IBM 2314 series disk drive which had been modified to allow attachment to the integrated file adapter (IFA) of the System/370 Models 135 and 145. The IFA supplied low-cost disk control function for these 370 models by eliminating the need for a channel and separate disk drive control unit. Memorex conceded that the IFA was a technological innovation which represented a cost saving to the user. In the design stage, IBM considered attaching several different disk drives to these intermediate systems. Memorex claims IBM chose the 2319A because it involved a change in interface that would assure that the first three drives attached to the central processing unit were IBM drives. It also challenged the price at which IBM offered the 2319A to customers. IBM contends that the 2319A, including the interface change, was based on sound engineering considerations, and led to the introduction of a better product at a lower price.

The interface change between the 2314 series disk drives and the 2319A was primarily the result of moving the customer engineering panel and the mixer board from the central processing unit to the drive. Memorex asserts that IBM's Apricot plan, which was one of the alternatives considered, would have resulted in an interface compatible with IBM's 2314 series disk drives, while the 2319A was introduced with a different interface. IBM argues that there were technological justifications for the new interface, and that neither Memorex nor any other plug compatible manufacturer had ever used the old interface so that Memorex disk drives would not have been compatible with the IFA under any circumstances.

Memorex's expert testified that there were sound reasons for the change on both sides of the interface. Locating the customer engineering ·panel in the disk drive reduced maintenance time and interference with the central processing unit. He also indicated that the gating circuits found in the 2319A mixer board are best located in the drive. Moving these two

assemblies out of the central processing unit saved space which was an important consideration in the design of the intermediate System/370 processors, especially the Model 135. Despite these advantages, Memorex's expert still maintained that the Apricot plan was superior. Where there is a difference of opinion as to the advantages of two alternatives which can both be defended from an engineering standpoint, the court will not allow itself to be enmeshed "in a technical inquiry into the justifiability of product innovations." *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1330 (5th Cir. 1976).

 IBM offered uncontroverted evidence that Memorex and other plug compatible manufacturers did not attach their disk drives at the interface between IBM's 2314 series disk drives and disk drive control units, but instead marketed entire replacement subsystems. Thus, Memorex would have had to make a change in its interface even if IBM had adopted the Apricot plan. Because Memorex never completed work on either interface, there is no real indication whether it would have found the new interface more difficult to reverse engineer than the old. An IBM expert testified that he had duplicated the new interface in six and one-half man weeks. The court does not see how Memorex was injured by this interface change.

The 2319A was priced by IBM at $1,000 or $333 per spindle. Memorex did not allege that this price was below marginal or average variable cost. Rather, it asserts that IBM should have adopted a price of $1,400 or $467 per spindle because IBM's financial analysis showed that at that price the drives themselves would generate greater revenue and profit. IBM offered evidence that its financial analysis also showed that its overall revenues and profits would be higher at the announced price because of additional sales of disk drives and systems beyond the 2319A's themselves. The court concludes that IBM's choice was proper. There is no evidence that the profitability of the 2319A depended on a future price increase, and even at the lower price,

IBM's price was above that of its competitors in most instances.

The 2319B was a lower cost, modified 3 spindle version of the 2319 disk drive for use on systems that did not offer the IFA feature. It attached to a 2314B disk drive control unit which connected to the central processing unit through a channel. This subsystem could be connected to any IBM system that had a channel, but was primarily attractive to System/360 users. The 2319 disk drive was primarily a reuse program. These drives were manufactured from 2313 series disk drives which were being displaced in the field by large System/370 models which used a later generation disk drive as well as by plug compatible disk drives. Memorex again challenged the engineering justification for the interface change between the 2319B and the 2314B, and the price at which IBM offered the 2319B to customers. IBM again contends that Memorex had never used the old interface, and that the 2319B was essentially a price cut involving 2314 series disk drives to match the 2319A price.

In 1970, Memorex and other plug compatible manufacturers were offering 2314-type disk drives at prices considerably below IBM's. The 2319B was IBM's answer to this competition. The 2319B interface was different than the interface on the 2314 series disk drives. IBM argued that this difference facilitated field conversion to the 2319A in the event that the user elected to move to one of the 370 systems that offered the IFA, and permitted transfer to a 2319A in the event of lease cancellation. Putting this justification aside, the court does not see how Memorex was injured by this interface change. Memorex and the other plug compatible manufacturers connected to the channel interface, not to the 2314 disk drive control unit, and the channel interface did not change.

Memorex did not allege that the 2319B was below IBM's marginal or average variable cost, and there was no evidence that IBM was sacrificing present profits with the expectation of recouping its losses with subsequent price increases. After the

2319B price reduction, IBM's competitors further lowered their prices, and Memorex's prices remained below IBM's in all but two configurations. Memorex asserts that the 2319B enabled IBM to price discriminate, but there is evidence that the new IBM subsystem was made generally available.

The court concludes that the 2319A and 2319B were reasonable responses by IBM to competition from the plug compatible manufacturers. Both were price cuts and in conjunction with the IFA, the 2319A was a significant product innovation.

### (4) THE NEW ATTACHMENT STRATEGY:

On August 2, 1972, IBM announced a number of new products that had been grouped together for a single announcement. Included in this announcement was the first of a series of products and central processing unit features which represented a different approach to the attachment of disk drives to computer systems. This approach has been termed the "New Attachment Strategy". It enables users to implement the disk control function in a variety of ways best suited to their individual needs. Memorex claims that IBM adopted the New Attachment Strategy because of all the possible alternatives, it had the greatest impact on plug compatible manufacturers in terms of interface changes. Memorex also challenged the prices at which IBM offered some of these products to customers. IBM contends that the New Attachment Strategy was an innovation, and that its prices were proper.

On IBM's System/360 computers, the disk drives and the disk drive control unit were separate boxes that connected to the central processing unit through a channel. The New Attachment Strategy altered this basic structure. In some cases, the disk control function was located partly in the central processing unit and partly in the first box of a string of disk drives. The idea was to put the device independent electronics in the central processing unit and the device dependent electronics in the disk drive so that later generations of disk drives did not require entirely new control units. Only the device dependent electronics in the first box of the new disk drives had to be changed. In other cases, the device independent electronics were packaged in a separate box, but the operating principle was the same.

Memorex argued that IBM should have used what its expert termed the "Simple Attachment Strategy." This approach preserved the channel/control unit/disk drive structure, and would have required fewer interface changes. IBM contends, and the court concludes, that it was a misnomer to call this attachment strategy "simple." Under the New Attachment Strategy, the capacity of each control device was increased from 8 spindles to 32. In addition, the use of string switching permitted access to disk drives by more than one central processing unit. Duplicating the flexibility of the New Attachment Strategy is not always possible under the Memorex attachment strategy, and where it is, the equipment configurations are more complicated.

Memorex claimed that the announcement of the New Attachment Strategy forced it to change some of its product designs early in the Memorex product cycle, that the IBM control alternatives were not priced consistently, and that IBM's phased announcements made it more difficult for Memorex to keep pace. IBM contends that time limits cannot be put on product innovations, and that coordinating product announcements with the stages of follow-on design work is both necessary and proper. IBM further contends that even if it is assumed that the prices for the control alternatives under the New Attachment Strategy varied in their relationship to IBM's costs, a company is not required to price all of its products at a constant markup from cost. The court refused to do so in United States v. United Shoe Machinery Corp., supra, 110 F.Supp. at 349.

The court concludes that the New Attachment Strategy was a significant innovation. At most, Memorex has only been able to show that there was an alternative approach available. Where the approach

chosen was at least as justifiable as the alternative, and in this case it appears to have been superior, courts should not get involved in second guessing engineers. *Response of Carolina, Inc. v. Leasco Response, Inc., supra.* The New Attachment Strategy was a reasonable response to competition.

(5) *THE 3705 COMMUNICATIONS CONTROL UNIT:*

Teleprocessing involves the communication of data between computer devices which are separated geographically and connected only by telephone or similar communications lines. Communications control units are generally located in proximity to a host processor, and perform the function of controlling the flow of data between the host processor and other devices that are remote from it. Teleprocessing first became generally available with IBM's introduction of the System/360 line of computers. The communications control units announced for use with System/360 were the 2701, 2702, and 2703 (the 270X series). These control units were introduced in 1964, and while they were innovative for their time, they were of limited flexibility because they were hardwired. A hardwired control unit is one whose function is controlled by its physical hardware. Its performance cannot be altered without rewiring it.

In the late 1960's, plug compatible manufacturers began to market communications control units in competition with the 270X. Memorex's entry was called the 1270. Like the 270X, the 1270 was hardwired. However, because the 1270 was announced in 1970, Memorex was able to take advantage of dramatic improvements in technology that took place after the 270X had been designed. Memorex was able to price its control unit below IBM's, and to offer more features. Thus, the 270X was becoming increasingly obsolete even as compared to other hardwired control units. Of greater long-run concern to IBM was the emerging competition from programmable communications control units. In contrast to a hardwired control unit, a programmable control unit is a stored program computer, and some of its functions can be varied simply by changing the software programming which runs it.

The trend in the industry was toward programmability, and the experts for both parties agreed that programmable control units had a competitive advantage. IBM sought to meet this competition with the introduction of the 3705 programmable communications control unit which was announced in March 1972. At the same time, IBM announced that two control programs would be available for this unit: an Emulator Program (EP) which would be available at the time of first customer shipment, and the more advanced Network Control Program (NCP) which was expected to be available by March 1973. EP made the 3705 perform as if it were one or more 270X's. Memorex did not really contest the fact that the 3705 was a product innovation. However, it challenged the pricing of the 3705, and the accuracy of the NCP announcement. IBM contends that both were proper.

By virtue of the fact that it was built later than the 270X, the 3705 was able to incorporate more modern circuitry, was more compact, could support more lines, and had better diagnostics. However, the major advantage was that it was programmable. In teleprocessing, users desire flexibility because they often change the configuration of their network, either by adding terminals or by changing the type of terminals. Programmable control units facilitate these changes. Memorex suggested that because EP was designed to allow the 3705 to emulate the function of the 2701, 2702, and 2703 control units, the 3705 with EP was not really an innovation. It is undisputed that even with EP, the 3705 allowed for much simpler transitions between the various configurations supported by the 270X control units because it had the capacity to emulate all of the 270X's hardware configurations. The 3705 with EP offered a number of other minor advantages as well, but its real value was as a migration aid to more sophisticated programming. The court concludes that even

with EP, the 3705 was a product innovation. The 3705 with NCP was an even greater innovation because it had the ability to offload functions from the central processing unit.

■■■ Memorex did not allege that the 3705 price was below IBM's marginal or average variable cost. Memorex offered evidence, which IBM disputed, that the price of a few of the many configurations of the 3705 did not return all of IBM's costs that might have been allocated to these products. However, Memorex conceded that the overall program was projected to be profitable, and this is the proper focus. *Janich Bros., Inc. v. American Distilling Co., supra.* There is no evidence that IBM was sacrificing present profits with the expectation of recouping its losses with subsequent price increases. The 3705 price while lower than the 270X price, was still higher than the price for Memorex's 1270. The court concludes that this price reduction was necessary to meet lower prices of IBM's competitors.

It was never entirely clear to the court what Memorex claimed was inaccurate about the announcement of NCP. The 3705 announcement had indicated that NCP would be available in March 1973. The actual delivery of NCP slipped six months to October 1973, but delivery slippages are not uncommon for complex new products in the computer industry. There is no evidence to suggest that when IBM announced NCP for delivery in March 1973, it did not honestly expect the product to be available at that time. Memorex argued that various internal IBM documents indicated that the Telecommunications Access Method (TCAM) which was the access method chosen to operate with NCP would not work. An access method is a program that resides in the host processor and performs the function of receiving the data from the communications control unit. IBM offered evidence that TCAM is in actual operation in a number of teleprocessing systems. The only problem with TCAM was that relatively few customers were using it, and it would be difficult to convince those who were using other access methods to switch. However, the fact that TCAM might have had limited market appeal did not make the NCP announcement misleading because the announcement made it clear that TCAM was required if a customer desired to use NCP. The court concludes that there was nothing knowingly false about the NCP announcement, and that the 3705 communications control unit was a reasonable response to competition.

## (6) *THE SYSTEM/370 MODELS 125 and 115:*

The System/370 Models 125 and 115 were IBM central processing units that were announced in October 1972 and March 1973, respectively. These processors were designed and marketed as low-end systems in the System/370 line of computers. It was anticipated that these two models would be fully compatible with the more advanced processors in the 370 family, and that they would provide a migration path for users of IBM's small systems such as the System/360 Model 20 and the larger models in the System/3 line. The 125 was initially planned to be the bottom entry in the 370 family. However, when it became apparent that the 125 would not meet its price objective, the lower-priced 115 was developed. It was intended that the Winchester disk drive would be the primary disk storage device for both these processors. Because the Winchester was not ready at the time of first customer shipment of the 125, IBM ultimately decided to attach the Merlin disk drive until the Winchester became available. The Merlin offered better price/performance than the older technology 2311 and 2314 series disk drives, and converting from Merlin to Winchester only required a simple change of microprogramming in the disk control device. The Winchester disk drive was available at the time of first customer shipment of the 115.

Disk drives were attached to both the 125 and 115 through a direct disk attachment (DDA) device. The DDA was part of the New Attachment Strategy, and was similar in principle to the integrated file adapter in

that it eliminated the need for a channel and separate disk drive control unit. Memorex argued that the 125 and 115 processors should have included a channel as well as the DDA. IBM contends that the cost of adding a channel would have defeated the low-price objective of these two models. Witnesses for both parties agreed that the DDA was the cheapest method for attaching disk drives. The additional cost of a channel would have had to have been borne by all users of the 125 and 115, regardless of whether they desired a channel. Furthermore, Winchester disk drives could not have been attached through a channel. The only benefit that would have been derived from the addition of a channel, the ability to do on-line data conversion, was accomplished in another manner.

IBM conceded that the DDA precluded attachment of 2311 and 2314-type disk drives, but it argued that other low-end computers, including Memorex's systems, have employed a design based on direct attachment of a limited range of disk storage devices to reduce costs. Another example of the emphasis on low cost attachment techniques in small systems was IBM's System/360 Model 20 which was the predecessor of the 125 and 115. It was uncontroverted that 2311-type disk drives and only 2311-type disk drives attached directly to the Model 20 processor, and that no channel was ever provided. In addition, there is evidence that Memorex was able to attach plug compatible disk drives to the 125 and 115 processors. The court concludes that the DDA was a product innovation, and that IBM was not required to provide a channel on the 125 and 115 to facilitate attachment of Memorex products.

■ Memorex also suggested that the 125 and 115 processors impacted its systems program, but its own witnesses acknowledged that the losses from this venture resulted from a shortage of capital. Still another complaint was that the DDA should have been separately priced. On the 115, the same circuits that comprise the DDA also perform other functions so they must be included in the processor in any event,

and neither the 125 nor the 115 will function without the disk drives that the DDA attaches. Memorex's expert indicated that the lower prices made possible by direct attachment made the channel/control unit/disk drive attachments used on some larger systems noncompetitive. Even assuming that the DDA is a separate product, the antitrust laws do not require separate pricing when no competitive alternative is available. *Response of Carolina, Inc. v. Leasco Response, Inc., supra,* 537 F.2d at 1330 n. 50.

Finally, Memorex challenged the accuracy of the 115 announcement. It claimed that the memory offered with the 115 processor was not capable of supporting virtual storage in a multiprogramming environment as represented. Multiprogramming was defined as doing two or more jobs at the same time. Memorex's own expert testified that there was no untrue statements in the announcement materials, and that the 115 could operate in two partitions as required for multiprogramming. The court concludes that there was nothing misleading in the 115 announcement, and that both the System/370 Models 125 and 115 were reasonable responses to competition.

■ The court has determined that all of the IBM acts challenged by Memorex were reasonable responses to competition. In the early 1970's Memorex and the other plug compatible manufacturers were making serious inroads into IBM's business. They had reverse engineered a number of the peripheral products that IBM marketed with the System/360 line of computers, and because they did not have to recover the costs of developing these products, they were able to undersell IBM. IBM met this competition by introducing a new generation of computers, the System/370, and by developing more advanced peripheral products that were able to take advantage of the latest technology and were offered to customers at lower prices.

Users clearly benefited from these product innovations and price cuts. They had a detrimental impact on Memorex and the other plug compatible manufacturers be-

cause of the need to undertake a new round of reverse engineering programs. However, this kind of conduct by IBM is precisely what the antitrust laws were meant to encourage. For the reasons indicated above, the court concludes that viewing the evidence as a whole, there is not substantial evidence present that could support a finding by reasonable jurors that any of IBM's acts were anticompetitive or predatory or unnecessarily excluded competition. Memorex sought to use the antitrust laws to make time stand still and preserve its very profitable position. This court will not assist it and the others who would follow after in this endeavor. It is hereby ordered that IBM's motion for a directed verdict on this ground is granted.

The court hereby grants IBM's motion for a directed verdict on all grounds stated, and finds that as a matter of law, the record in this case cannot justify a verdict by a reasonable jury in favor of Memorex.

Having ruled upon IBM's motion for a directed verdict, the court hereby makes a separate and distinct ruling in the event of a remand for retrial.

### STRIKING OF THE JURY DEMAND IN THE EVENT OF A REMAND FOR RETRIAL

As indicated above, the jury in the trial of this action was asked to decide whether IBM monopolized or attempted to monopolize various markets in the computer industry. Memorex alleged that certain IBM price cuts and product changes in the early 1970's violated the antitrust laws, while IBM's defense contended that any injury suffered by Memorex was caused by poor management. Resolution of these issues required an understanding of a vast amount of advanced computer technology and sophisticated financial principles. The trial lasted for five months and consumed 96 trial days. The parties called 87 witnesses whose testimony filled more than 19,000 pages of transcript. More than 2,300 exhibits were admitted into evidence. After deliberating for 19 days, the jury reported itself hopelessly deadlocked, and the court declared a mistrial.

Before the jury was selected, IBM moved to strike Memorex's jury demand on the ground that the issues in the case were too complex for a jury to fairly decide. The court denied IBM's motion at that time, but since the trial ended as it did, the court feels that this question deserves further consideration in light of its experience.

The Seventh Amendment to the United States Constitution preserves the right of trial by jury "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." In England and in the federal courts in the United States until 1938, there was a clear division between law and equity. This situation changed with the adoption of the Federal Rules of Civil Procedure. In *Ross v. Bernhard,* 396 U.S. 531, 539–40, 90 S.Ct. 733, 739, 24 L.Ed.2d 729 (1970), the Supreme Court said:

> Under the Rules there is only one action—a "civil action"—in which all claims may be joined and all remedies are available. . . . Under the Rules, law and equity are procedurally combined; nothing turns now upon the form of the action or the procedural devices by which the parties happen to come before the court.

The Court indicated that "[t]he Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." *Id.* at 538, 90 S.Ct. at 738. The Court continued in a footnote:

> As our cases indicate, the "legal" nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries. *Id.* at 538 n. 10, 90 S.Ct. 738.

The issue in *Ross v. Bernhard* was whether the Seventh Amendment guaranteed the right to a jury trial in stockholder's derivative actions. Rejecting the argument that the derivative action was an equitable device, the Court held that "the Seventh Amendment preserves to the parties in a stockholder's suit the same right to a jury

trial that historically belonged to the corporation and to those against whom the corporation pressed its legal claims." *Id.* at 542, 90 S.Ct. at 740.

Before examining the nature of the issues in this case in terms of the three factors enumerated in *Ross v. Bernhard,* two other Supreme Court decisions must be considered briefly. In *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the court held that where equitable and legal claims are joined in the same action, there is a right to a jury trial on the legal claims which may not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims. In *Beacon Theatres,* the Court said:

> The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. . . . Inadequacy of remedy and irreparable harm are practical terms, however. As such their existence today must be determined, not by precedents decided under discarded procedures, but in the light of the remedies now made available by the Declaratory Judgment Act and the Federal Rules.

359 U.S. at 500, 79 S.Ct. at 954.

It continued later in the decision:

> Since in the federal courts equity has always acted when legal remedies were inadequate, the expansion of adequate legal remedies provided by the Declaratory Judgment Act and the Federal Rules necessarily affects the scope of equity.

359 U.S. at 509, 79 S.Ct. at 956.

In *Dairy Queen,* the Court said:

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres,* the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that

only a court of equity can satisfactorily unravel them.

369 U.S. at 478, 82 S.Ct. at 900.

These cases demonstrate that the inadequacy of legal remedies is the primary basis for granting equity jurisdiction, and that the complexity of a case is relevant to this inquiry.

▮ Under the test set forth in *Ross v. Bernhard,* the nature of an issue is determined by looking first to the premerger custom. With reference to private antitrust actions, the Supreme Court in *Fleitmann v. Walsbach Street Lighting Co.,* 240 U.S. 27, 29, 36 S.Ct. 233, 234 (1916), indicated that "when a penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law." *See also, Beacon Theatres, Inc. v. Westover, supra,* 359 U.S. at 504, 79 S.Ct. 948. These same comments are applicable to the consideration of the second factor deemed significant in *Ross v. Bernhard.* The remedy sought by Memorex for IBM's alleged antitrust violations is damages which has traditionally been regarded as a legal remedy. It is the third factor of the equation, the practical abilities and limitations of jurors, that causes the court to conclude that the issues in this case must be considered to be equitable.

In reaching this conclusion, the court recognizes that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935). However, "to hold that a jury trial is required in this case would be to hold that the Seventh Amendment gives a single party at its choice the right to an irrational verdict." *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, at 71 (S.D.N.Y. 1978).

While there is no authority cited for the third factor in the *Ross v. Bernhard* test, in *Fowle v. Laurason,* 30 U.S. (5 Pet.) 495, 503, 8 L.Ed. 204 (1831), the Supreme Court said:

446

In all actions in which an action of account would be the proper remedy at law . . . the jurisdiction of a court of equity is undoubted. It is the appropriate tribunal. But in transactions not of this peculiar character, great complexity ought to exist in the accounts, or some difficulty at law ought to interpose . . in order to induce a court of chancery to exercise jurisdiction.

Some fifty years later in *Kirby v. Lake Shore & Michigan Southern Railroad Co.,* 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569 (1866), the Court said:

The case made by plaintiff is clearly one of which a court of equity may take cognizance. The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement.

Thus, at an early date, the Supreme Court recognized that equity had a special role to play in the trial of complex cases.

Several subsequent decisions suggested that mere complication of facts was not a sufficient basis for equity jurisdiction. In *United States v. Bitter Root Development Co.,* 200 U.S. 451, 472–73, 26 S.Ct. 318, 325, 50 L.Ed. 550 (1906), the Supreme Court said:

The bill shows that whatever was done in the way of cutting timber and carrying it away was done by the defendants as tort feasors, and the various devices alleged to have been resorted to by the deceased, Daly, by way of organizing different corporations in order to, as alleged, cover up his tracks, and to render it most difficult for the complainant to make proof of his action, does not in the least tend to give a court of equity jurisdiction on that account. It is simply a question of evidence to show who did the wrong and upon that point the fact could be ascertained as readily at law as in equity.

And in *Curriden v. Middleton,* 232 U.S. 633, 636, 34 S.Ct. 458, 58 L.Ed. 765 (1914), the Court said:

Being a suit for damages, the proper remedy is an action at law, as was held below. [Citation omitted] It is said that the facts are complicated, but they are not so on the allegations of the bill, which merely discloses a series of acts alleged to have been parts of the plan to deceive; and further, mere complication of facts alone and difficulty of proof are not a basis of equity jurisdiction.

In this case, more is involved than simply complicated facts. The accounting and especially the engineering concepts are far beyond the experience and understanding of an ordinary jury.

Jury demands have been stricken in three recent cases. In *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 104 (W.D. Wash.1976), the court said:

Central to the fairness which must attend the resolution of a civil action is an impartial and capable fact finder. A properly selected panel of veniremen must generally be presumed to yield an impartial and capable jury. However, at some point, it must be recognized that the complexity of a case may exceed the ability of a jury to decide the facts in an informed and capable manner. When that occurs, the question arises as to whether the right and necessity of fairness is defeated by relegating fact finding to a body not qualified to determine the facts. The third part of the analysis in footnote 10 to the majority opinion in *Ross v. Bernard [Bernhard], supra,* recognizes this.

An additional problem the court foresaw was that "any jury chosen to hear this case will not be a fair cross section of the community at large because of the estimated trial time of four to six months." *Id.*

In *In re United States Financial Securities Litigation,* 75 F.R.D. 702, 710 (S.D.Cal. 1977), the court said:

The basis for granting equity jurisdiction over cases of extraordinary complexity is, of course, the inadequacy of the legal

remedy, or more specifically, the inadequacy of the jury to handle the case and render a fair decision, as the Court noted in *Dairy Queen*. Recently the Court had occasion to formulate a test which is to be used in deciding whether a case is legal or equitable in nature. One part of the test is whether a jury is capable of rendering such a decision; if it is not then the case should be tried in equity by the court without a jury.

The court listed three guidelines for deciding whether a particular case is so complex that equity jurisdiction will attach and permit the case to be tried without a jury:

First, although mere complexity is not enough, complicated accounting problems are not generally amenable to jury resolution. Although such problems often arise only during the damages portion of a trial, they sometimes are present during the liability portion as well. . . .

Second, the jury members must be capable of understanding and of dealing rationally with the issues of the case.

And third, an unusually long trial may make extraordinary demands upon a jury which would make it difficult for the jurors to function effectively throughout the trial.

*Id.* at 711.

When these criteria, and especially the second, are applied to the facts of this case, they clearly favor a court trial.

Finally, in *Bernstein v. Universal Pictures, Inc., supra*, at 70, the court said:

Assuming a minimum length for a trial in this case of four (4) months, an estimate which I now consider low, it would be impossible to empanel a representative jury in this case, whose verdict would enjoy the appearance of fairness.

In addition, the sheer size of the litigation and the complexity of the relationships among the parties render it *as a whole* beyond the ability and competence of any jury to understand and decide with rationality. Of course, antitrust cases in general are by their very nature complex, so that special rules have been developed in response to their complexity. [Citation

omitted] The ordinary antitrust case is clearly within the competence of juries. This lawsuit is the exception case, not the rule. [Emphasis by the court]

These comments, made in the context of an antitrust case, are equally applicable here.

The teaching of these three cases is that where the issues in a case are beyond "the practical abilities and limitations of a jury," the legal remedy is inadequate and equity jurisdiction will attach. The court concludes that such a situation exists in the present case, and that the posture of this case poses a different problem than confronted the courts in *Boise Cascade, United States Financial,* and *Berstein v. Universal Pictures.*

In those cases, the decision to strike the jury was made before trial. While the courts were able to draw upon their experience as trial courts in evaluating the complexity of the cases and the nature of the issues involved, their conclusions were inescapably somewhat speculative. Here, on the contrary, the court is able to base its decision on its own observations during the five month trial. The jurors were conscientious and diligent, but their past experience had not prepared them to decide a case involving technical and financial questions of the highest order.

Throughout the trial, the court felt that the jury was having trouble grasping the concepts that were being discussed by the expert witnesses, most of whom had doctorate degrees in their specialties. This perception was confirmed when the court questioned the jurors during the course of their deliberations and after they were discharged. When asked by the court whether a case of this type should be tried to a jury, the foreman of the jury said, "If you can find a jury that's both a computer technician, a lawyer, an economist, knows all about that stuff, yes, I think you could have a qualified jury, but we don't know anything about that." (Tr. 19,548). Several of the other jurors indicated that they thought that the major stumbling block was the

requirement that the verdict be unanimous. When they were questioned after the trial, most of the jurors indicated that they thought a complex antitrust case like this one should be tried to the court.

The parties initially estimated that the trial of this case would last ten months. Because the hardship that such a long trial would impose on the jurors was obvious, a special pool of 175 prospective jurors was called in for this case. After excuses, there were only 29 candidates remaining from which to select 14 jurors. The 11 jurors to whom this case was submitted probably represented a random cross-section of people in the community who could afford to spend 10 months serving on a jury, but it is open to question whether they were a true cross-section of the community. The six men and five women on the jury ranged in age from 32 years to 65 years, with the majority over 50. Several of the jurors were housewives, one was retired, and those who were employed worked at jobs where they could be replaced, but where neither their jobs nor their incomes were in jeopardy. Only one of the jurors had even limited technical education. While the court was appreciative of the effort they put into deciding the case, it is understandable that people with such backgrounds would have trouble applying concepts like cross-elasticity of supply and demand, market share and market power, reverse engineering, product interface manipulation, discriminatory pricing, barriers to entry, exclusionary leasing, entrepreneurial subsidiaries, subordinated debentures, *stock options, modeling, and* etc.

An additional consideration which the court feels warrants discussion is the burden that cases of this type impose upon the judicial system. The trial of this case occupied the time of the court and its staff almost exclusively for seven months. Because of the estimated length of the trial, the court went off the new case assignment wheel for its duration, thereby increasing the work load of the other courts and personnel of the Northern District. In addition, the jury expenses (borne by the government in this case) amounted to more than $32,000. All of this time and expense went for naught when the court was forced to declare a mistrial.

When a trial is by jury rather than to the court, there is the possibility that no decision will be made. In this case, a second trial by jury could very easily suffer the same fate as the first because the composition of the jury will not change significantly. While there may be a right to a jury trial in every case, the court feels that where the cost to both the litigants and the government of such a trial is as great as it was in this case, and where the case is as technically and financially complex as this one is, this right should be limited to one jury trial.

As heretofore stated, the court has reviewed those cases in which a jury demand has been stricken. In all previous instances this was done before trial. It may be that through the use of good pretrial procedures, the complexity of a case (both in law and fact) can become known. However, in the instant case the court has listened to all the evidence and argument, and reviewed the law, and it is after the fact (i. e. trial) that the court has come to the conclusion that in the event of a retrial of this case it would not serve the ends of justice that the final outcome be determined by a lay jury verdict. Even if one does not want to eliminate jury trials completely in complex antitrust cases, then surely if the first trial results in a mistrial, the system, and probably the parties themselves, are better served if the decision is ultimately made by the court, with the right of the parties to supplement the record.

For the reasons indicated above, the court hereby finds that the magnitude and complexity of the present lawsuit render it, as a whole, beyond the ability and competency of any jury to understand and decide rationally, and orders, in the event of a remand for retrial, that Memorex's jury demand be stricken. The jury was originally conceived as a protective shield between the litigants and the danger of an arbitrary decision by the sovereign. It would be a

subversion of this ideal to insist upon submitting a case to a jury when there is a substantial risk that its decision will be arbitrary.